FILED
8/19/19 3:23 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| CHRISTOPHER JONES | : | Case No. 17-11233-TPA |
| *Debtor* | : | Chapter 7 |
| | : | |
| SILVESTRI HOMES WNY, LLC | : | Adversary No. 18-01011-TPA |
| *Plaintiff* | : | Related to Doc No. 4 |
| | : | |
| v. | : | |
| | : | |
| CHRISTOPHER JONES | : | |
| *Defendant* | : | |

Appearances:   Helen Ward, Esq., Counsel for Silvestri Homes WNY, LLC
Lawrence Willis, Esq., Counsel for Christopher Jones, Debtor

## **MEMORANDUM OPINION**

This is an action by Plaintiff Silvestri Homes WNY, LLC ("Silvestri Homes") seeking to have its claim against the Debtor, Christopher Jones ("Jones") found to be excepted from discharge in this bankruptcy. The claim in question arises from an ill-fated home improvement contract that was entered into by Silvestri Homes and Jones Contracting, LLC ("Jones Contracting"), an entity owned by and formerly operated by Jones, its principal.

Silvestri Homes takes the position that its claim is non-dischargeable under *11 U.S.C. §§ 523(a)(2), (4)*, or *(6)*. The case was tried on February 26, 2019. Post trial briefs have been filed, final arguments presented and the time for filing post argument supplemental briefs has concluded,

therefore the matter is ripe for decision.  For the reasons that follow, the Court will find in favor of

Silvestri Homes and hold that Silvestri Homes has a claim against Jones in the amount of $23,157.91

that is excepted from discharge pursuant to *11 U.S.C. §523(a)(4)*.[1]


### FACTS


Silvestri Homes is a Nevada limited liability company that is owned by an individual

named Jonathan Silvestri ("Silvestri") who resides in the Buffalo, New York area.  Silvestri had

been a banker for about ten years but was laid off from his job.  Looking for an alternative way to

make a living, Silvestri and his wife formed Silvestri Homes in late 2016 for the purpose of

"flipping" homes.  As will be familiar to viewers of many reality-based cable television shows,

flipping involves buying a home, repairing or remodeling it, and then re-selling it with the hope of

making a profit.  Silvestri's plan was to engage the services of contractors to do the bulk of the work

on the houses that Silvestri Homes would be purchasing to flip and thereby realize a worthwhile

profit on the transaction.


Defendant/Debtor Christopher Jones is a resident of Erie, Pennsylvania, which is located

approximately 90 miles from Buffalo.  Jones, who has been in the home contracting business for

over 20 years in various capacities, formed Jones Contracting in August 2016 as a Pennsylvania

limited liability company and is the sole member and manager thereof.  Jones Contracting was in

---

[1]

This adversary proceeding is a core matter pursuant to *28 U.S.C. §157(b)(2)(I)*.  The Court
has subject matter jurisdiction pursuant to *28 U.S.C . §§157* and *1334*.  Silvestri Homes has
consented to the entry of final orders and judgments by the Court.  *See*, Amended Complaint at ¶5,
Doc No. 4.

the business of providing home improvement services as a general contractor.  Simultaneously with

the formation of  Jones Contracting, Jones also registered "Michael Jones" as a fictitious name for

himself and used that pseudonym in forming Jones Contracting.

Silvestri Homes began operations in late 2016, with Silvestri scouting  for prospective

properties that would be good flipping opportunities.  During that process, Silvestri Homes and

Jones Contracting, and the two principals, Silvestri and Jones individually, became acquainted with

each other through a web site utilized by Silvestri to locate contractors to do work for Silvestri

Homes. Silvestri and Jones met and discussed  two properties that Silvestri had in mind for the first

flipping project for Silvestri Homes.

Jones toured both properties and gave Silvestri proposals as to both.  As a result of this

meeting and discussion, Silvestri settled on a residential dwelling  located at 185 LeHavre Drive,

Buffalo, N.Y. (hereinafter, "the Property") as the initial house to be purchased by Silvestri Homes.

The Property was in need of considerable work,  and Silvestri inquired about Jones Contracting's

experience and capabilities to determine whether it would be able to do the job.   He also  raised

concerns about Jones Contracting being able to undertake the work given the distance involved, and

about how he could be assured that Jones Contracting would not just "run off" with any money it

was paid and not perform the work.  Jones informed Silvestri that Pennsylvania law required home

contractors such as Jones Contracting to be bonded.

Silvestri was apparently satisfied with the responses to his questions because on January

26, 2017, Silvestri Homes and Jones Contracting entered into a fixed price contract for "whole home

renovation" work on the Property.  The contract was prepared by Jones using software he had

acquired about a decade earlier.  Attached to the main contract agreement were a number of

schedules setting forth the work that was to be done, which was extensive, including new siding,

new roof, new windows, basement remodel with new bathroom, removal of an addition, concrete

driveway, and other things.

The contract provided for a total price of $32,895, to be paid via an initial deposit of

$10,899 due at signing, a "special order deposit" of $10,000 due upon commencement of the work,

six separate progress payments of $1,496 due weekly after the commencement of the work, and a

final payment of $3,020 due upon completion of the work.  The contract provided for an

approximate start date of February 9, 2017, and an approximate completion date of March 29, 2017,

with an outside date of two months from the start date to complete.  The contract also acknowledged,

however, that change orders, unusual weather, or owner-related delays could delay completion.

Silvestri Homes made the required initial $10,899 deposit at the time the contract was signed.

There was an initial impediment to starting the work due to a death in Jones' family, and

with the consent of Silvestri, the first day of work was extended to February 15, 2017, at which time

Silvestri Homes paid Jones Contracting an additional $10,000 per the contract.  Jones Contracting

had a 3-man crew doing work on the project, consisting of Jones himself and employees Jeremy

Jones and Chris Slater.

The demolition of the addition was among the first items of work performed.  In the

course of doing so it was discovered that there was suspected asbestos siding on the house

underneath the outer layer of siding.  Under the terms of the contract it was the responsibility of

Silvestri Homes to address asbestos removal.  Despite the suspected asbestos, the demolition of the

4

addition was completed, but whereas previously the plan by Jones Contracting had been to first do the outside work on the Property, it was jointly decided to shift to doing inside work first to allow the asbestos siding on the remainder of the house to first be removed.

Jones Contracting worked on the project through April 6, 2017.  Throughout this period it never worked a full-time schedule on the project, instead generally working 2 or 3 days per week. Throughout this time period Silvestri Homes made all of the required progress payments to Jones Contracting.  On April 17, 2017, after not having shown up to work  on the project for 11 days, Jones sent an e-mail to Silvestri explaining that he was "double-booked" and had another job that had to be completed before he could return to do any further work on the Property.  Silvestri responded with an e-mail of his own expressing dissatisfaction with the slow pace of work and proposing that either  the contract be revised to implement a strict schedule for completion of the remaining work or that the Parties reach an agreement to end the contract so Silvestri Homes could hire someone else to complete the work.  Jones did not respond to that proposal, but on April 18th he returned to the Property and retrieved many of his tools for use on the other job.

During the next several weeks Silvestri made numerous attempts to contact Jones through e-mail and phone calls or texts, but Jones did not respond.  On May 8th Silvestri sent an e-mail to Jones indicating that he would be making a demand for arbitration pursuant to the contract. That finally drew a response from Jones in which he admitted being responsible for delay on the project, but also blamed Silvestri for some of the delay, a contention to which Silvestri vigorously responded in disagreement.  Silvestri Homes filed and served a "Statement of Claim" against both Jones Contracting and Jones individually on May 23, 2017, with the American Arbitration

5

Association, alleging claims of breach of contract, breach of the covenant of good faith and fair dealing, and fraudulent misrepresentation. Upon completion of the arbitration, an arbitration award was entered in favor of Silvestri Homes, as discussed further below.

Photographic and other evidence presented at the trial showed that the work on the Property was very far from being completed at the time Jones Contracting ceased work on April 6th. Aside from the demolition of the addition, none of the outside work such as roofing and siding was performed. Considerable work was done inside by Jones Contracting, but a significant portion of the work remained unfinished. The record is clear that in order to complete the work on the Property, Silvestri Homes would have had to incur additional expense.

## *DISCUSSION*

### *(1) The Arbitration Award*

Before turning to the main issues raised in the case, the Court will first revisit a matter previously addressed, that being the effect in this case, if any, of the arbitration proceeding that Silvestri Homes initiated in May, 2017. Earlier in this adversary Silvestri Homes filed a motion for summary judgment based on the purported collateral estoppel effect of the arbitration award. In an order dated December 20, 2018 denying that motion for summary judgment the Court explained why it would not give such effect to the award. *See,* Doc. No. 59. Rather than just incorporate that prior order here, the Court believes it will be more helpful to briefly recap in this *Memorandum Opinion* the relevant procedural history of the arbitration proceeding and reiterate its reasoning for rejecting Silvestri Homes' argument that collateral estoppel applies.

Following the filing of the Statement of Claim by Silvestri Homes on May 23, 2017, Jones represented both himself and Jones Contracting throughout the arbitration proceeding, though the Parties stipulated that he did speak with an attorney and get some advice about the case. Silvestri Homes was represented in the arbitration by Attorney Phillip Silvestri of the Greenspoon Mander Law Firm from Las Vegas, Nevada. Phillip Silvestri is the brother of Jonathan Silvestri.

There was considerable delay before a final arbitration hearing was convened. In large part this was due to the actions of Jones, who avoided accepting service and in order to stall the process used the ruse that "Michael Jones" was a real, and distinct, person and unavailable for the arbitration.[2] Silvestri Homes itself also bears some responsibility for the delay, however, in that *ex parte* communication between its counsel and the arbitrator at an initial arbitration hearing resulted in the nullification of the first arbitration hearing, the removal of the initial arbitrator, the appointment of a new arbitrator, and a second arbitration hearing.

The final arbitration hearing took place in Buffalo on October 24, 2017, and it resulted in an arbitration award that was entered on November 21, 2017, with a finding in favor of Silvestri Homes in the amount of $91,589.02 against both Jones Contracting LLC and the Debtor.[3] However,

---

[2]

As previously noted, Jones registered "Michael Jones" as a fictitious name at the same time he formed Jones Contracting and used it in forming the company. *See p.3, supra.*

[3]

It is unclear on what basis Jones, individually, was named as a Respondent in the Statement of Claim. The contract which provided for arbitration of disputes was only between Silvestri Homes and Jones Contracting. So far as the Court is aware Jones individually was never contractually bound by any obligation to arbitrate, nor has the Plaintiff advanced any other reason to show why Jones was required to arbitrate. *See, e.g., Hamilton Park Health Care Ltd. v. 1199 SEIU United Health Care Workers East*, 817 F.3d 857, 864 (3d Cir. 2016) ("Where a party has not executed an

four days before that award was entered, on November 17, 2017, Jones had initiated the present

bankruptcy case by filing a basic petition, without the required accompanying Schedules.  Neither

Silvestri Homes nor the arbitrator were aware of the bankruptcy filing at the time the arbitration

award was entered  because Silvestri Homes was not listed in the mailing matrix filed by Jones.[4]

On February 8, 2018, Silvestri Homes initiated this adversary proceeding, and it also

filed a *Motion of Silvestri Homes WNY, LLC for Relief from the Automatic Stay Nunc Pro Tunc*  at

Doc. No. 21 in the main case ("Relief from Stay Motion").  The *Relief from Stay Motion* alleged that

neither Silvestri Homes nor the arbitrator had been aware of the bankruptcy filing at the time the

award was entered.  It asked for relief from stay for cause, and granted  *nunc pro tunc*, so that the

findings by the arbitrator could be used in the adversary proceeding.  Jones was represented by

counsel in the bankruptcy, but his counsel did not respond to the *Relief from Stay Motion*  and a

CNO[5] was filed on February 27, 2018, resulting in the entry of a default order granting relief from

stay to Silvestri on February 28, 2018, without hearing.

---

express agreement to arbitrate, we must therefore discern whether any 'traditional principles of contract and agency law' can make it nonetheless bound by an arbitration provision.").  By failing to raise any objection to being individually named as a Respondent in the Statement of Claim and participating in the process, the *pro se*-acting Jones may well have unwittingly waived an available defense to the arbitration and been deemed to have consented to participate. Even so, an agreement to arbitrate is a keystone of arbitration practice so the somewhat suspect basis for Jones' presence in the arbitration is a relevant factor when deciding  whether the arbitration award should be given any preclusive effect here.

[4]
On December 10, 2017, Jones completed his petition and Silvestri Homes is shown as a creditor in Schedule E/F with a claim in an amount shown as "unknown" based on "lawsuit."

[5]
"CNO" ("Certificate of No Objection") is a pleading form used in this Court to allow for entry of a proposed order on a default basis.

On March 15, 2018, Jones, acting *pro se*, filed an answer in the adversary proceeding. The first pretrial conference in the adversary proceeding was then held on April 12, 2018.  At that time Jones stated that he was representing himself in the adversary proceeding and claimed that he had never received the *Relief from Stay Motion*, which had been served only on  his bankruptcy attorney.   Following that conference the Court issued a pretrial discovery order, and on April 19, 2018, it also issued an Order to Show Cause on Jones' bankruptcy attorney directing him to appear and explain why he was not representing Jones in the adversary when his fee agreement with Jones was unclear on whether such representation was excluded  from his services.  Jones' Counsel was also questioned as to why he ignored the *Relief From Stay Motion* filed by Silvestri Homes and allowed a default order to be entered.  He had no acceptable answer.  Following a hearing held on April 26, 2018, the Court issued an order vacating the Order to Show Cause and directing bankruptcy counsel to also represent Jones in this adversary proceeding.

Discovery was conducted in the adversary proceeding and on November 14, 2018, Silvestri Homes filed the motion for summary judgment referred to above, relying exclusively on the arbitration award, and principles of collateral estoppel as a basis for judgment.  As also noted above, the Court rejected that argument and denied the motion for summary judgment in its December 20, 2018 Order.  The Court did so because no evidence was presented to show that the arbitration award was ever reduced to judgment and it is thus not entitled to full faith and credit treatment under *28 U.S.C. §1738. McDonald v. City of West Branch*, 466 U.S. 284, 287 (1984); *Jacobson v. Fireman's Fund Ins. Co.,* 111 F.3d 261, 266-67 (2d Cir. 1997) ("Under New York law, it is the judgment entered on an arbitration award that is given preclusive effect in subsequent

litigation ... an arbitration award that is not filed and confirmed in an appropriate court is without effect.") No such evidence was presented at the trial either.

Since it is not entitled to full faith and credit, the effect, if any, to be given the arbitration award is governed by federal common law. The applicable authority that binds this Court directs that arbitration awards that have not been reduced to judgment are to be carefully scrutinized, and that if there are any doubts about applying collateral estoppel principles they should usually be resolved against such use. *See, e.g., NLRB v. Yellow Freight Systems, Inc.*, 930 F.2d 316, 319 (3d cir. 1991), *Witkowski v. Welch*, 173 F.3d 192, 206 (3d Cir. 1999).

In this instance the Court did have doubts about the arbitration at the time it decided the motion for summary judgment, some of which were listed in the December 20, 2018 Order which stated:

> Among those reasons [for being skeptical of the arbitration award] are the lack of any detailed record to demonstrate what occurred at its arbitration, some seeming discrepancies between the allegations in the "pleadings" of the arbitration and its Award, and the fact that Jones was included as a party in the arbitration in his personal capacity even through there is nothing to show that he personally ever agreed to be bound to arbitration.

Doc. No. 59. The December 20, 2018 Order also raised questions about the manner in which attorney fees were granted in the arbitration, and the fact that the bankruptcy case had been filed at the time the award was issued. *Id.*

Having now heard the evidence that was presented at trial, more questions arise. For example, the arbitrator found that Jones' use of the "Michael Jones" fictitious name in forming Jones Contracting was relied on by Silvestri in believing that he was retaining a viable limited liability

corporation with sufficient resources and personnel to fulfill its obligations, and that Michael Jones was a real person who would play a role in completing the project. *See*, Exhibit A at 2-3. The Court has no idea how the arbitrator could have made such a finding of reliance since, as will be discussed further below, the evidence showed that Silvestri did not even become aware of the Michael Jones name until after the arbitration had been initiated, long after the contract was signed.[6] A finding such as this with no apparent basis in evidence leaves the Court with little confidence in the arbitration award. The Court is also still perplexed as to how the arbitration award could have included an attorney fee component, and a very substantial one at that, added after the formal arbitration hearing, and with no opportunity given to Jones to contest it.

The Court therefore reiterates that it does not give any collateral estoppel effect to the arbitration award. Furthermore, had the Court been fully sensitive as to all the relevant facts and circumstances at the time it originally entered the default order granting the *Relief from Stay Motion*, it would not have found sufficient cause to justify a grant of the *Motion*, leaving the arbitration award void *ab initio* and a legal nullity since it was entered after the bankruptcy case had been filed and the automatic stay had gone into effect. *Maritime Electric Co., Inc., v. United Jersey Bank*, 959 F.2d 1194, 1206 (3d Cir. 1991), *In re Ali*, 321 B.R. 685 (W.D. Pa. 2005).

The Court will therefore go one step further than the December 20, 2018 Order so as to remove any uncertainty and vacate its prior order granting the *Relief from Stay Motion*. The Court

---

[6] Silvestri testified that he first became aware of "Michael Jones" when he received correspondence purportedly from "Michael Jones," right before one of the hearings in the arbitration proceeding. His exact testimony was: "Now we had to spend all this time researching who is this Michael Jones person who just came out of the blue..." *See Audio Transcript of Proceedings* on Feb. 26, 2019 at 11:51:13 to 11:51:112.

finds it has the power to do so *sua sponte* pursuant to *Fed.R.Bankr.P. 9024*, incorporating *Fed.R.Civ.P. 60.  See, e.g., In re Davitch*, 336 B.R. 241 (Bankr. W.D. Pa. 2006), *In re Watters*, 2007 WL 3069326 *3 (Bankr. D. N.J., Oct. 18, 2007).  It also has grounds for doing so on the basis that the said Order was entered through mistake or inadvertence, *Fed.R.Civ.P. 60(b)(1)*, or because the totality of circumstances as discussed herein are a reason justifying relief from the Order, *Fed.R.Civ.P. 60(b)(6)*, or pursuant to its "inherent power to alter an order at any time before final disposition of the case."  Hon. Michael Kaplan, *Reconsidering Reconsideration*, 38 ABI Journal, No. 4 at 22, text at n. 2 (April 2018) (citing authority for such power).  With the prior grant of stay relief vacated, the arbitration award – having been entered in violation of the automatic stay – is found to be void and of no effect.[7]

### (2)  Exception to Discharge

*11 U.S.C.  §523(a)* describes 19 different recognized categories of exceptions to discharge.  Creditors bear the burden of proving an exception to discharge under these provisions by a preponderance of the evidence.[8]  *Grogan v. Garner*, 498 U.S. 279, 291 (1991).  *Section 523(a)*

---

[7]

While Plaintiff's Counsel testified at the June 25, 2019 fee hearing that it was his impression that the December 20, 2018 Order denying summary judgment vacated the relief from stay Order, actually that Order simply noted "[F]or instance, although it will not do so at this time, the Court notes that it has authority that can be exercised *sua sponte* to reconsider and vacate the relief from stay previously granted."  *See* Doc No. 89, p. 2, *supra*.

[8]

Under *Fed.R.Bankr.P. 4005*, the plaintiff in an action for nondischargeability under *Section 523(a)* has the burden of proof.  Additionally, however,  "the rule leaves to the courts the formulation of rules governing the shift of the burden of going forward with the evidence in the light of considerations such as the difficulty of proving the nonexistence of a fact and of establishing a fact as to which the evidence is likely to be more accessible to the debtor than to the objector."

is strictly construed against creditors and liberally construed in favor of debtors in furtherance of the "fresh start' policy under the Bankruptcy Code. *In re Cohn*, 54 F.3d 1108, 1113 (3d Cir. 1995), *In re Mehta*, 310 F.3d 308, 311 (3d Cir. 2013) (exceptions to discharge construed narrowly against the creditor in consideration of the underlying rehabilitative policy of the Bankruptcy Code). The Supreme Court has stated that exceptions to discharge "should be confined to those plainly expressed." *Kawaauhau v. Geiger*, 523 U.S. 57, 62 (1998).

As was indicated above, Silvestri Homes points to three categories of exception to support its position: *Section 523(a)(2)(A)* (false representations, actual fraud); *523(a)(4)* (fraud or

---

*Advisory Committee Notes to Rule 4005*. Some courts have used that authority to adopt a shifting burden in *Section 523(a)* cases, holding that where the creditor/plaintiff makes out a prima facie case on the required elements, the burden of production then shifts to the debtor to establish a defense to the creditor's claim. If the debtor is unable to establish a viable defense, the creditor will prevail on its action, but if a viable defense is forthcoming, it remains the creditor's overall burden to persuade the trier-of-fact, by at least a preponderance of the evidence, as to the sufficiency of its claim. *See, e.g., In re Brumbaugh*, 383 B.R. 907, 915 (Bankr. N.D. Ohio 2007). For instance, to rebut a prima facie case of fraud under *Section 523(a)(2)(A)*, a debtor must come forward with evidence which raises in the Court a credible doubt as to the existence of fraudulent intent. *Id.* The status of such a burden shifting procedure in *Section 523(a)* cases in the Third Circuit is not entirely clear. In *In re Cohn*, 54 F.3d 1108 (3d Cir. 1995) the court seemed to indicate that a burden shifting approach should not be utilized, noting that in other areas of commercial law where fraud is alleged, courts have not used a shifting burden of production, and stating that a "shifting burden is no more necessary in the realm of discharge in bankruptcy than in any other area of commercial litigation in which fraud is alleged. It is sufficient that fraud must be pled and proven with particularity." *Id.* at 1119-20. That result would seem to require no burden shifting to be employed, but on the other hand *Cohn* was decided under *Section 523(a)(2)(B)*, a provision dealing with false financial statements that is not at issue in the present case, so there is room for some doubt as to whether it applies here. In any event, however, as will be discussed subsequently in this *Memorandum Opinion*, the Court does not find that the Plaintiff here has even made out a prima facie case under any of the *Section 523(a)* subsections it is relying on, save for the *Section 523(a)(4)* claim for defalcation by a fiduciary for which Debtor has provided no viable defense other than that some of the trust funds were appropriately spent and accounted for. As such, the Court need not decide whether burden shifting would be appropriate here when finding that the Plaintiff has not met its burden in this case.

defalcation while acting as fiduciary); and *523(a)(6)* (willful and malicious injury).  Each of these

will be considered in turn.

### (a)  Section 523(a)(2)

Silvestri Homes has placed most of its emphasis in this case on *Section 523(a)(2)(A)*,

which provides in relevant part  that:

> (a)     A discharge under section 727 ... of this title does not
> discharge an individual debtor from any debt –
> ...
>> (2)     for money, property, services, or an extension,
>> renewal, or refinancing of credit, to the extent obtained
>> by–
>>> (A)    false pretenses, a false representation, or
>>> actual fraud, other than a statement respecting the
>>> debtor's or an insider's financial condition;

*11 U.S.C. §523(a)(2)(A)*.   Focusing further, Silvestri Homes argues that Jones made false

representations that induced it to enter into the contract.  Three such representations are raised: (1)

that Jones created Jones Contracting under the name of a fictional person, Michael Jones; (2) that

Jones stated Jones Contracting was bonded when in fact it was not; and, (3) that Jones stated the

$10,000 special order deposit was required to purchase materials for the project when no such

materials were purchased.  *See Amended Complaint*, Doc No. 4 at ¶21.

In order for a debt to be excepted from discharge under *§ 523(a)(2)(A)* a creditor must

prove, by a preponderance of the evidence, all of the following:

> (1)     The debtor obtained money, property, or services through a
> material misrepresentation;

(2)     The debtor, at the time, knew the representation was false or
made with gross recklessness as to its truth;

(3)     The debtor intended to deceive the creditor;

(4)     The creditor justifiably relied on the debtor's false
representation; and

(5)     The creditor sustained a loss and damages as a proximate result
of the debtor's materially false representations.

*In re Sevastakis*, 591 B.R. 197, 202 (Bankr. D.N.J. 2018). *See also, In re Presutti*, 540 B.R. 154,
171 (Bankr. W.D. Pa. 2015). None of the three alleged misrepresentations cited by Silvestri Homes
is capable of sustaining a finding of non-discghargeability under *Section 523(a)(2)(A).*

The first of these representations is the use by Jones of the fictitious persona "Michael
Jones" to create Jones Contracting as a Pennsylvania limited liability company. Jones claimed at
trial that he did so for liability-avoidance purposes based on advice of counsel. Without some
further explanation, the Court can certainly understand why that rationale would be met with
suspicion. However, in the first instance, if Jones did make a false representation in forming Jones
Contracting, the representation in question was made to the Commonwealth of Pennsylvania, and
not to Silvestri, so there is some question whether it even constitutes a "representation" for purposes
of this *Section 523(a)(2)(A)* action being brought by Silvestri Homes.

Even assuming *arguendo* that Jones made a misrepresentation in forming Jones
Contracting, such misrepresentation clearly cannot be a basis for an exception to discharge under
*Section 523(a)(2)(A)* due to a lack of reliance, and the consequent failure by Silvestri to establish
the fourth required element in the list reproduced above.

There is no evidence that Silvestri even knew about the use of the Michael Jones name until well after the contract had been formed and payments to Jones Contracting under the contract had already been made. The evidence instead indicates that Silvestri Homes only became aware of Jones' use of the Michael Jones name when it was preparing for the arbitration and the name arose "out of the blue." *See* n. 6, *supra*. As such, there is no way that Silvestri Homes can be said to have justifiably relied on the Michael Jones representation in entering into the contract and making the payments thereunder. *See also, e.g., In re Booher*, 284 B.R. 191, 201 (Bankr. W.D. Pa. 2002) (creditor cannot demonstrate required reliance if debtor obtained consideration prior to having made misrepresentation). While the use of the Michael Jones name to form Jones Contracting may have been improper,[9] it does not render any debt related to the contract excepted from discharge.

The next "misrepresentation" relied upon by Silvestri Homes in support of its claim is that the Debtor stated Jones Contracting was "bonded," when in fact it was not. The *Complaint* alleges that Jones made a false representation by:

... stating that the Debtor's firm was bonded when, in fact, there was no bond ...

*Amended Complaint* Doc. No. 4 at ¶ 21. In it's *Post-Trial Brief,* Plaintiff framed the alleged misrepresentation regarding a bond as follows:

---

[9]

As mentioned above, there was also persuasive evidence presented at trial to show that Jones engaged in communications allegedly from the fictitious Michael Jones as a means to delay the start of the arbitration. That was clearly improper and calls the Debtor's overall credibility into question, but again, that event occurred well after the fact and is no basis for finding an exception to discharge under *Section 523(a)(2)(A)*.

> Jon testified that the Debtor specifically responded to Jon's inquiry, stating that he was bonded, that he had to be bonded under Pennsylvania law, and that he "couldn't run away with [Silvestri's] money."

*Post-Trial Brief*, Doc. No. 80 at p. 2.

The only evidence that was presented at trial concerning the alleged false misrepresentation by Jones as to Jones Contracting being bonded was the testimony of Silvestri. In order to provide a clear basis for its conclusion as to this alleged misrepresentation, the Court will quote all the relevant material directly from the trial testimony, as appears in the recorded audio file of the trial. The only reference to the alleged bonding misrepresentation occurred in some answers to questions posed immediately after Silvestri had recounted advice his father had given him about the need for vigilance with respect to selecting a contractor and financing the project (advice which Silvestri admitted he did not heed), and the colloquy proceeded as follows:[10]

Q.   And did you ask Chris Jones about the financing on the project?

A.   Yes, definitely. We met at the project, we went to lunch afterwards, and I was specifically concerned about the deposits – the fact that I was putting down close to two-thirds of this project's costs up front, before really, he did any work. And so I said to him, I said I'm concerned about the fact that you can just take off with my money. And he said that in Pennsylvania contractors have to be bonded, and that it's a law, so for that reason he can't just walk or, you know, run away with my money. And so I was very confident at that point. Again, hindsight's 20-20; I should have done more research as to actually if he was bonded, but I was new to construction. I didn't really – I was excited to start working on the project and so I relied on his information, what he told me, you know, that he wasn't just going to take off with my money. I trusted him.

Q.   And you believed that he was bonded at that time?

---

[10]    In this excerpt the questioner is Plaintiff's attorney and the person answering is Silvestri.

A.      Absolutely.

Q.      And you believed him when he said he wouldn't take off with your money?

A.      Absolutely.

Q.      Did you rely on the statement that he was bonded?

A.      100%

Q.      Did you rely on the statement that he wouldn't take off with your money?

A.      Definitely.

Q.      Did you ultimately enter a construction contract with Jones Contracting?

A.      Yes, I did.

Q.      Why did you decide to enter into that contract?

A.      Basically what we were just talking about.  I was comfortable
        No. 1  with the fact that he was bonded and couldn't take off with
        my money, and No. 2 the price that he gave me was good....

*See,  Audio Transcript of Trial* dated February 26, 2019, 10:23:32 to 10:25:37.

When Jones testified at trial he was never asked by either Plaintiff's counsel or his own attorney if he had made a statement as Silvestri claimed.  Thus, given Silvestri's uncontradicted testimony, which represents the entire "universe" of evidence that was presented on this point, the Court finds that Plaintiff has proven by a preponderance of the evidence that Jones did make a verbal statement as described in the above trial excerpt prior to the formation of the contract.

While Jones' statement as testified to by Silvestri is not an explicit assertion that Jones Contracting was itself bonded, the Court finds that result to be the clear implication of the words used, and is satisfied that such representation can be said to have been made. Even so, the Court is

18

not convinced that the testimony presented can meet the Plaintiff's initial burden and support a

finding of nondischargeability under *Section 523(a)(2)(A)*.

To begin with, as was noted above, reliance is one of the elements that Plaintiff must

prove under *Section 523(a)(2)(A)*. Silvestri's testimony is a two-edged sword in that regard. While

he testified that he relied on Jones' statement, elsewhere in his testimony he said things (see

discussion below) that call into question whether such reliance was "justifiable," the standard he was

required to meet. *See, Field v. Mans*, 516 U.S. 59 (1995) (finding that plaintiff in a *Section

523(a)(2)(A)* action must show "justifiable reliance," described as being an intermediate level

between reliance in fact and reasonable reliance). An inquiry as to whether reliance was justifiable

is a subjective one and focuses on the "qualities and characteristics of the particular plaintiff, and

the circumstances of the particular case, rather than of the application of a community standard of

conduct to all cases." 516 U.S. at 71 (quoting *Restatement (Second) of Torts §545a*, comment b

(1976)).

Silvestri testified as to a number of matters that are relevant on the question of whether

his reliance was justifiable. Silvestri testified that he had attended college to study business finance.

*Audio Transcript of Trial* dated February 26, 2019 at 10:14:27 to 10:14:35. He also testified that

following college he had worked as a banker for about ten years prior to being laid off and forming

the Plaintiff in late 2016. *Id.* at 10:14:48 to 10:15:55. Given this background, the Court presumes

that Silvestri was conversant with prudent business practices that should be followed when entering

into a significant contract. And if that were not enough, Silvestri also testified that prior to entering

into the contract with Jones Contracting he'd  had conversations with his father, who warned him

of the need to be very careful when entering into this type of contract. *Id.*, 10:22:50 to 10:23:26.

19

Silvestri freely conceded that in hindsight he should have confirmed the existence of a

bond. *Id.* at 10:23:26 through 10:23:33.   He failed to take what would have been that simple step

because he was excited to begin work on the project.   *Id.*   Also bearing on the issue of justifiable

reliance, Silvestri  failed to provide any evidence as to what he understood Jones to mean by saying

that Pennsylvania contractors were required to be bonded, what kind of bond he thought was being

referred to by Jones, and how he thought it would benefit Silvestri Homes if Jones Contracting was

bonded.[11]  For all these reasons the Court has serious concerns as to whether the Plaintiff has met

the justifiable reliance standard in this case.

Secondly, based on Silvestri's testimony it is clear that Jones' statement concerning a

bond was made  prior to the formation of the contract.  That is significant because (a) the contract

contains an integration, or merger, clause (Article 1.1 providing in part: "These contract documents

represent the entire agreement of both parties and supersede any prior oral or written agreement"),

and (b) it says nothing whatsoever about Jones Contracting representing that it was "bonded."

Article 9 of the contract is entitled "Insurance," and one would think that if the existence of some

sort of bond for Jones Contracting were of material importance to Silvestri Homes it would have

been set forth in that provision or elsewhere in the contract.  Instead, the contract only includes a

provision that Jones Contracting "shall purchase and maintain needed General Liability Insurance

coverage as required by law and deemed necessary for his own protection."  Contract, Article 9.2.

---

[11]

The term "bond" is an extraordinarily complex one, with a definition covering some 15 pages
in the on-line version of *Black's law Dictionary* (11th Ed. 2019) as accessed on Westlaw, and
encompassing dozens of different types or categories within the definition.  In the Court's view,
given the vagueness of the term "bond" and its importance to Plaintiff's theory of the case, it was
incumbent on Plaintiff to provide some basic information to answer the sort of questions as laid out
in the main text, but it failed to do so.

The absence of a mention of any type of bond in the integrated contract poses another potential problem for Plaintiff because the parol evidence rule[12] would likely prevent evidence of Jones' prior oral statement being considered to vary the terms of the contract, even in the face of a claim of fraudulent inducement, at least under Pennsylvania law. *See, e.g., Intellisystem, LLC v. McHenry*, 2019 WL 2715373 (E.D. Pa. June 26, 2019) ( Under Pennsylvania law parol evidence may not be admitted based on a claim that there was fraud in the inducement of a contract, citing *Yocca v. Pittsburgh Steeler Sports, Inc*., 854 A.2d 425 (Pa. 2004)).  This same sort of scenario prompted another bankruptcy court to reject a *Section 523(a)(2)(A)* claim based on an oral representation as to a bond that was not reflected in the written agreement. *See, In re Tanner*, 365 B.R. 217, 234 (Bankr. N.D. Ala. 2007) (plaintiff's execution of an integrated contract that failed to say anything about a bond implicitly contradicted his assertion that he had an understanding that the debtor contractor was bonded based on alleged oral representation).

The reliance and parol evidence issues thus raise serious questions about the viability of Plaintiff's *Section 523(a)(2)(A)* claim related to the statement about a bond, but the Court elects not to simply rely on those matters in deciding this case but primarily base its decision on an even more fundamental level, namely, that Plaintiff has not proven Jones' bond statement was false, or that Jones knew at the time that it was false, or that he made the statement with gross recklessness as to its truth.

---

[12]

Despite its name, the parol evidence rule is a rule of substantive contract law, and thus the failure of the opposing side to object to the admission of parol evidence to vary or contradict the terms of a contract does not affect the rule's applicability. *See*, Hon. Barry Russell, *Bankruptcy Evidence Manual* (2017-2018 Ed.) at §9.1.  Therefore, the fact that Jones did not raise an objection to the parol evidence at trial is not dispositive.

Following the trial, the Court's impression was that Plaintiff had not proven the falsity

of the statement, but in order to make sure it fully understood Plaintiff's position on this point, at

the final argument it specifically asked Plaintiff's Counsel what evidence was being relied upon to

show that a misrepresentation as to bonding had been made. In response, Plaintiff's Counsel pointed

only to the  testimony of Silvestri quoted above.

An even cursory review of Silvestri's testimony,  however, shows that it does nothing

to establish that the statement about bonding was false.  No other evidence was presented at trial to

show that such  representation was false, that Jones Contracting was actually not bonded at the

relevant time, that Jones knew the representation to be false, or that he made it with gross

recklessness as to its truth at the time it was made.  Silvestri Homes had ample opportunity to

demonstrate the purported falsity of the statement, but it never followed up on the initial testimony

of Silvestri, quoted  above, as to the bonding requirement with additional testimony from Silvestri,

or documentary evidence, or answers to discovery requests designed to elicit whether or not Jones

Contracting in fact was bonded when Jones made the statement.[13]  Jones was called as a witness

during the defense case and  was subject to extensive cross-examination, but he was never asked

about the bonding issue.

The Court notes that in its factual narrative portion of  the Joint Pretrial Statement,

Silvestri Homes identifies a <u>proposed</u> trial stipulation to the effect that "Debtor admits now, he *was*

---

[13]

Indeed, because the Plaintiff was so adamant at the final argument that the misrepresentation
as to bonding had been proven, the Court reviewed the trial record several more times (the results
of which appear above) to determine if it had missed anything on this point, but it had not.

*not bonded* ...." Doc. No. 49 at 14 (emphasis in original).  Jones never agreed to such stipulation,

however, and a bare statement in a pretrial narrative like this is not itself evidence.  If Silvestri

Homes had some evidence to support such an admission by the Debtor it should have been presented

at trial.  The Joint Pretrial Narrative Statement, which identifies any <u>actual</u> stipulations of the Parties

for purposes of trial, also includes some stipulated facts in a separate section, but the only one even

touching on the bond issue provides as follows:

> 3.   During the negotiations regarding the work on the Property, the
> principal of Plaintiff, Jonathan Silvestri ("Jon") specifically inquired as
> to whether Jones Contracting was bonded.  The parties dispute Debtor's
> response to this inquiry.

*Id.* at 18.  Again, this stipulation says nothing about whether Jones Contracting was bonded, and if

anything, it demonstrates that Silvestri Homes was aware that the bonding issue was unsettled,

which makes its failure to offer any proof at trial that Jones' statement was false even more

inexplicable.

Finally, in its *Post-Trial Brief* Plaintiff makes the unsupported assertion that:

> ... [t]here was no bond,...

*Doc. No. 80* at p. 3.  Despite the Court's careful scrutiny, there is no record evidence from the trial

to support that statement.

The Court cannot simply presume the falsity of the representation regarding bonding or

Jones' awareness of such falsity.  To do so would improperly shift the burden of proof to the Debtor.

Silvestri Homes was required to present some evidentiary basis to demonstrate that the

representation was false by showing that Jones Contracting was in fact not bonded when Jones made

his statement, or that Jones knew or recklessly disregarded whether there was an existing bond, but

Plaintiff failed to do so and thus failed to meet its burden.[14]  For example, in *In re Secrest,* 255 B.R.

16 (Bankr. S.D. Ohio 2000)  a creditor filed an adversary complaint against the debtor alleging that

a debt related to a construction contract should be found nondischargeable under *Section

523(a)(2)(A)* because the debtor had falsely represented he was bonded.  The creditor presented no

evidence to prove that the debtor was not bonded, and the court found that it therefore "cannot

conclude the Defendant made false representations as to his credentials." 255 B.R. at 20.  *See, also

e.g., In Re Ali*, 321 B.R. 685, 692 (Bankr. W.D. Pa. 2005) (where creditor failed to preponderantly

prove the falsity of the representation it could not prevail under *Section 523(a)(2)*); *In Re Neubert*,

309 B.R. 185, 187 (Bankr. W.D.Pa 2004) (same); *In Re Ratz,* 2012 WL 2026096 *5-6 (Bankr.N.D.

Ill. June 5, 2012) (discussing debtor's failure to prove falsity of statements re licensing,

qualifications, and insurance); *In Re Oliveira*, 2007 WL 2908624 (Bankr. D. Mass. Sept. 28, 2007)

(objections to discharge based on statements that were not proved to be false must be overruled).

Silvestri Homes had every opportunity to present evidence to show that Jones' statement

regarding a bond was false or made with gross recklessness.  It did not do so.  The Court may not

assume Jones' statement was false merely based on the fact that Silvestri Homes has not been paid

for Jones Contracting's failure to complete the project.  There are too many plausible other

possibilities that would explain such non-payment without Jones' statement needing to be false or

---

[14]

In addition to the burden of proof being placed squarely on the shoulders of the party seeking an exception to discharge, in this case Silvestri Homes, it is also important to keep in mind the longstanding principle that exceptions to discharge must be strictly construed in favor of the debtor. *In re Fegeley*, 118 F.3d 979, 983 (3d Cir. 1997).

recklessly made.  For instance, perhaps there was a bond in place when the statement was made but

it was subsequently cancelled, or perhaps Jones reasonably but incorrectly thought there was a bond

in place when there was not, or perhaps there was a bond in place but it did not cover this claim for

some reason or Jones did not submit it.  Given all of this uncertainty, the Court must find that

Silvestri Homes has failed to meet its burden of proof as to elements 1 and 2 of the *Section 523(a)(2)*

claim with respect to the bonding statement.[15]

The final representation which Silvestri Homes points to is with respect to the $10,000

special order deposit.  The contract itself does not specify, but Silvestri credibly testified that this

deposit was to be used to purchase roofing, siding, and windows.[16]  Unlike the first two

representations, this one concerned a future event or promise.  Essentially, Silvestri Homes argues

that by including the special order deposit in the contract Jones Contracting was promising to use

those funds for the purchase of  materials for the project, and that it then failed to do so.  A failure

to perform a future obligation as promised, however, is generally only a breach of contract.  It is

only when a promise of future performance is made by one who has no present intention of

performing the promise that it can be considered a misrepresentation for purposes *of Section*

*523(a)(2).  See, e.g., In re Giquinto*, 388 B.R. 152, 166 (Bankr. E.D. Pa. 2008) ("It is a matter of

---

[15]

To the extent Plaintiff may argue that the part of the Jones' statement to the effect that he could not run away with Silvestri's money was itself  a separate misrepresentation,  distinct from the statement regarding a bond, the Court rejects such argument as well.  The facts do not support a characterization that Jones "ran away" with Silvestri's money.

[16]

Jones testified that the "special order deposit" as set forth in the contract was originally intended to be used for the purchase of materials but was subsequently converted by oral agreement into a "commencement deposit."  It was not entirely clear from Jones' testimony whether he meant to imply that such change in terminology effected a change in the intended use of the funds, but to the extent he did the Court rejects such testimony as not credible.

well-entrenched jurisprudence that a contractor's failure to perform as promised, standing alone, gives rise to a case for breach of contract, not actionable fraud, misrepresentation or false pretenses under *§523(a)(2)(A)*"). In order to show a misrepresentation, it was Silvestri Homes' burden to prove by a preponderance of the evidence that Jones did not intend to purchase materials with funds from the special order deposit at the time the contract was formed. *Ali, supra*. In finding such an intent, the Court may consider the "totality of circumstances" in deciding whether Silvestri Homes has met its burden. *Giquinto, supra*, citing *In re Cohn, supra*.

After carefully considering all the evidence presented at trial, the Court concludes that Silvestri Homes has not met its burden in this regard. The testimony showed that Jones Contracting started work on the project on February 15, 2017, a few days later than the "approximate" start date of February 5th as stated in the contract, Jones having offered the excuse of a death in his family with no significant pushback by Silvestri. That in itself is of some significance in that at the time of commencement Jones Contracting had already received $20,899 from Silvestri Homes under the contract, or approximately 63% of the total contract price, without yet having done any work. If the intent had always been to bilk Silvestri Homes and never purchase materials with the special order deposit money, then why even start the work rather than just immediately abscond with the money already received?[17]

---

[17]
    Plaintiff argues that the Debtor's return to work on the project on several occasions subsequent to entering the contract is further proof of an original fraudulent intent. Despite some definite credibility issues regarding Debtor's testimony as to some other matters in the case, the Court believes under the circumstances and in light of all the testimony received regarding the Debtor's return to the job site, the evidence more credibly supports a contrary finding. While the Debtor intended to complete the work upon his various returns to the project, the press of other commitments began to interfere with the Plaintiff's job, and when he started receiving "push back" from Silvestri over Plaintiff's concerns about completing the work, that's when the Debtor left the project.

It was also undisputed that the original plan had been to begin work on the outside of the structure and then shift to the inside after that was completed. Very early on, however, during demolition of an addition, suspected asbestos siding was unexpectedly discovered under the outer layer of vinyl siding, resulting in a dramatic shift in the planned order of work. Inside work would now be done first while Silvestri Homes made arrangements to have the suspected asbestos siding properly removed in accordance with Article 11 of the contract. The suspected asbestos siding on the remainder of the Property had still not been removed by early April when Jones Contracting ceased work on the project. In the Court's view this circumstance provides a more plausible explanation as to why Jones Contracting did not purchase siding and roofing materials (since they would not have been needed until work shifted back to the outside) than that it (and therefore the Debtor) had never intended to buy the materials.

It is less clear as to whether the third category of materials that were to have been purchased with the special order deposit, *i.e*., windows, could have been installed before the outside work was completed. Jones testified that the windows were of a "new construction" type that could not be installed until the outside work was completed. He also testified that the windows would have been in the way on the job site, which appears to be saying that the windows could not yet have been installed.

Silvestri Homes makes much of some text messages from Jones beginning on April 9, 2018, in which he first tells Silvestri that the windows have come in and then about a week later tells him that they fell off the truck. No evidence was provided at trial by Jones to show that any windows were ever actually purchased, and the Court concludes that the text message statements

27

to Silvestri concerning the windows were false.  However, the Court also finds that those false statements, made well after the contract had been formed, while admittedly available to undermine Jones' overall credibility, are not conclusive  on the key question of Jones' intent several months earlier at the time of contract formation.  Under all of the aforementioned circumstances the Court finds it as least as likely that Jones' statements in this regard were just an effort to placate a property owner who was becoming increasingly impatient with the slow progress of the work.

The Court thus concludes that the third representation cited by Silvestri Homes, like the other two,  does not satisfy the elements for an exception to discharge under *Section 523(a)(2)(A)* because of a failure by Silvestri to have proven Jones' intent with respect to the special order deposit at the critical time of the contract formation.  *Ali, supra; In Re Dizinno*, 559 B.R. 400, 409 (Bankr. M.D. Pa. 2016) (broken promise to take future action is not fraudulent unless promisor did not intend to keep the promise "at the time it was made"); *In Re Crawford*, 476 B.R. 890, 896 (Bankr. W.D.Pa. 2012) (to establish actual fraud on the basis of failure to perform as promised, plaintiff must prove debtor entered into agreement with no intention of complying with the terms).

Absent direct evidence or an express admission by a witness, proving intent is a very difficult proposition.  As such, a party may rely on circumstantial evidence, and often must do so absent a clear expression of actual intent.  Here, the circumstantial evidence of the Debtor's intent at the time of entering the contract offered by the Plaintiff does not rise to a level commensurate with the Plaintiff's burden to demonstrate that intent by a preponderance of the evidence.  For this reason, the Court is constrained to deny the complaint with respect to the nondischargeability claims alleged under *Sections 523(a)(2)(A)*.

28

### (b)   Section 523(a)(4)

In its *Amended Complaint* Silvestri Homes also raised *11 U.S.C. §523(a)(4)* as an alternative basis for finding the debt excepted from discharge, though the emphasis it placed on that provision there and at trial was clearly secondary to *Section 523(a)(2)*.  The relevant language of that statute provides an exception to discharge  for a debt:

> (4)   for  fraud  or  defalcation  while  acting in a fiduciary
> capacity, embezzlement, or larceny...

*11 U.S.C. §523(a)(4)*.  To meet its burden of proof under *Section 523(a)(4)* Silvestri Homes was required to show that Jones was acting in a fiduciary capacity and that he committed fraud or defalcation while acting in that capacity. *See, e.g., Aiello v. Aiello*, 550 B.R. 83, 87 (W.D. Pa. 2016), *In re Hayes*, 183 F.3d 162, 167 (2d cir. 1999).

The thesis advanced by Silvestri Homes in the *Joint Pretrial Narrative Statement* as to why *Section 523(a)(4)* applies here is that Jones admitted to being a fiduciary of Jones Contracting during his pre-trial deposition.[18]  No such testimony was provided at trial, however, so apparently Silvestri Homes has abandoned that particular line of argument.  In any event, case law generally does not support the imputation  of  fiduciary status for purposes of *Section 523(a)(4)* merely because of the debtor's status as an officer or shareholder of a corporate entity, particularly with respect to creditors of the corporate entity.  *See, e.g., In re Roemmele*, 2011 WL 4804833 (Bankr.

---

[18]

Silvestri Homes has nowhere advanced embezzlement or larceny as grounds for finding that *Section 523(a)(4)* applies in the present case, nor does the evidence support such a contention in any event.

E.D. Pa. October 11, 2011) ("Pennsylvania law imposes fiduciary duties upon a director of a corporation; however, most courts have held that these fiduciary duties imposed by operation of law do not rise to the level of imposing a technical trust for purposes of *11 U.S.C. §523(a)(4)*."), *In re Brown*, 557 B.R. 363, 372-73 (Bankr. E.D. Pa. 2016) ("The majority of bankruptcy courts do not hold that a partner or other corporate officer is a fiduciary for purposes of *§523(a)(4)*"); *In re Teckenbrock*, 2012 WL 3818220 *4 (Bankr. S.D.N.Y. September 4, 2012) (fiduciary duties which debtor may owe as officer or controlling shareholder of corporate entity does not mean debtor acts in fiduciary capacity as to creditors of the corporation).   The Court therefore finds no ground for an exception to discharge here under *Section 523(a)(4)* based solely  on Jones' status as the owner/chief officer  of Jones Contracting.

That having been said, the evidence presented at trial suggested the possibility of a different basis for a finding of the existence of a fiduciary relationship  under *Section 523(a)(4)*, namely, the statutory trust created by the law of the State of New York in connection with home improvement contracts such as the one  involved here.[19]  Before discussing that point, the Court must first explain why it concludes that New York law is applicable concerning the contract.[20]

---

[19]

Given the amount of "lawyering" this case has received in both the arbitration and in this adversary proceeding the Court is somewhat taken aback that this alternative basis was never raised by the Parties.  Having become aware of the New York statute in question on its own in the course of preparing this *Memorandum Opinion*, the Court felt obligated to consider it even though the Parties themselves had not mentioned it.  Because of the potential due process concerns thereby raised, the Court alerted the Parties to this issue at the final argument and allowed them to file supplemental post-trial briefs on it if they chose, which both did.

[20]

There was testimony at trial by Jones that he had intended the contract to be governed by the law of Pennsylvania.  Perhaps so, but there was no testimony that Silvestri Homes had that same intent, and the contract itself does not include a choice of law provision.  As also noted previously,

The only two obvious candidates for the law of decision regarding the Silvestri Homes/Jones Contracting contract are Pennsylvania and New York. Because this Court sits in Pennsylvania, it must apply Pennsylvania choice of law rules in deciding that matter. *See, e.g., In re SemCrude L.P.*, 864 F.3d 280 (3d Cir. 2017). The Court must first identify whether there are any relevant differences between the laws of the two states since, if there are none, no real conflict exists and the Court may refer to the laws of the two states interchangeably. *In re Prithvi Catalytic, Inc.*, 2015 WL 1651433 *7 (Bankr. W.D. Pa. April 6, 2015). If a conflict is found to exist, then the Court must examine the interests and policies of the two states to determine the nature of the conflict and the extent to which one state has a greater interest in having its law applied to the matter. *Id*.

Both Pennsylvania and New York have statutes that deal specifically with home improvement contracts. *See, Pennsylvania Home Improvement Consumer Protection Act, 73 P.S. §§517.1 through 517.8* (hereinafter, collectively, "Pennsylvania Law") and *New York Article 36-A "Home Improvement Contracts," McKinney's Consolidated Laws of New York, General Business Law §7710 through 776*, and *New York Article 3-A, Mckinney's Consolidated Laws of New York, Lien Law, §§70, 71-a(4)* (hereinafter, collectively, "New York Law"). The contract at issue here appears clearly to fall within the definition of a "home improvement contract" under both Pennsylvania Law and New York Law. *See, 73 P.S. §517.2.* ("An agreement between a contractor ... and an owner for the performance of a home improvement ...", with home improvement defined as "[r]epair, replacement, remodeling, demolition ... [etc.] of a building used or designed as a private

---

Article 1.1of the contract includes the following: "These contract documents represent the entire agreement of both parties and supersede any prior oral or written agreement." The contract does not contain a choice of law provision and the Court must therefore decide which state's law to apply.

31

residence and the adjoining land") and *New York General Business Law §770(6)* (similar to the Pennsylvania Law definition, with further caveat that the contract must be for more than $500).

Although both Pennsylvania Law and New York Law include many similar provisions designed to protect the owners of residential properties that are the subject of home improvement contracts, one key difference is that New York Law imposes certain requirements on a contractor who receives advance payments from the property owner for such contracts and creates a lien and trust related to such payments, whereas  Pennsylvania Law does not include any such provision. *New York Lien Law §70(1)* provides in relevant part that

> [t]he funds described in this section ... received by a contractor under or in connection with a contract for improvement of real property or home improvement ... shall constitute assets of a trust for the purposes provided in section seventy-one of this chapter.

*Section 70(2)* then states in relevant part that

> [t]he funds received by a contractor ... under or in connection with each contract ... shall be a separate trust and the contractor ... shall be the trustee thereof.

*Section 70(3)* provides that the trust thus created continues until every trust claim arising at any time prior to completion of the contract has been paid or discharged, or until all assets have been applied for purposes of the trust, and *Section 70(6)* defines the assets of the trust as the funds received by the contractor under the contract.  Under *New York Lien Law §§71(2)(f)* and *71a(11)(d)*, the property owner is a beneficiary of the trust.

32

Since the difference between Pennsylvania and New York law on this point is highly

relevant for purposes of the *Section 523(a)(4)* exception to discharge claim, the Court finds that a

true conflict exists between the laws of the two states. *See also, In re Dombroski*, 478 B.R. 198, 203

(Bankr. M.D. Pa. 2012) (also finding a conflict between New York Law and Pennsylvania Law on

this same point). The Court must therefore proceed to determine which state's law to apply.

Pennsylvania has adopted the flexible approach of the *Restatement of Conflict of Laws,*

*Second* (hereinafter "Restatement") for choice of law analysis. *Griffith v. United Air Lines, Inc.*,

203 A.2d 796 (Pa. 1964). With respect to an action based on a contract:

> The rights and duties of the parties with respect to an issue in contract
> are determined by the local law of the state which, with respect to that
> issue, has the most significant relationship to the transaction and the
> parties...

*Ario v. Underwriting Members of Lloyd's of London Syndicates 33, 205 & 506*, 996 A.2d 588, 595

(Pa. Commw. Ct. 2010) (quoting *Restatement §6*). The factors to be considered in this analysis

include (1) the place of contracting, (2) the place of negotiation of the contract, (3) the place of

performance, (4) the location of the subject matter of the contract, and (5) the domicile, residence,

nationality, place of incorporation and place of residence of the parties. *Id.* (quoting *Restatement*

*§188(2)*). When that analysis is done here the overwhelming weight of the factors falls on the side

of New York as the state whose law should be applied.

Based on the testimony presented at trial, the Silvestri Homes/Jones Contracting contract

was definitely negotiated in New York and appears to have been signed in New York as well. The

place of performance was also in New York, where the Property to have been renovated is located.

33

Thus, the first four factors all point clearly to New York.  The fifth factor is more of a wash, with Jones Contracting being a Pennsylvania entity that had its place of business in this state and Silvestri Homes being a Nevada entity with its place of business in New York.  That single "split" factor does not overcome the strong preference for application of the law of  New York Law arising from all the other factors.

Having decided that the law of New York applies, the Court may now turn to a discussion of whether a fiduciary relationship within the meaning of *Section 523(a)(4)* was created in connection with the contract , if so whether Jones personally had any fiduciary responsibility since he was not a party to the contract, if so whether Jones engaged in fraud or "defalcation" under *Section 523(a)(4)*, and finally, assuming a positive answer to all of the preceding, what is the amount of the non-dischargeable claim.

The Bankruptcy Code itself does not define the term "fiduciary."  Applicable case law establishes that:

> The definition of 'fiduciary capacity' is a matter of federal law, which has consistently limited its scope to the capacity of one who holds property under either an express trust or ... a technical trust." "Although the necessary fiduciary relationship under *§ 523(a)(4)* is a question of federal law, state law determines the existence of a trust." ... "A technical trust is [commonly taken by courts today to mean] a trust imposed by state common law or statute."

*In re Sabo*, 2005 WL 6761116, at *2 (Bankr. W.D. Pa. Oct. 5, 2005) (quoting *In re Ardolino*, 298 B.R. 541 (Bankr. W.D. Pa. 2003)).

New York Law did impose a statutory trust in this instance.  Under *N.Y. Lien Law §71-a(4)* contractors who receive money in advance from the property owner for  home improvements are required within 5 days to place the money in an escrow  bank account in a bank located in New York and hold the money in trust as the property of the owner until the money is paid for purposes of the home improvement.[21]  The funds deposited remain the property of the owner until: (1) proper payment by the contractor for the purposes of the home improvement project; or (2) default or breach by the owner which excuses the contractor's performance, but only to the extent of any reasonable liquidated damage amount and only after 7 days prior written notice to the owner; or (3) substantial performance of the contract by the contractor.  *§ 71–a (4)(a),(d).   See also*, *Stern v. H. Dimarzo, Inc*.,  867 N.Y.S.2d 20 (N.Y. Sup. 2008) (*Lien Law* requires contractors who receive money in advance for home improvements to hold them in trust, for the benefit of the property owner, until the money is paid out for the purpose of the home improvement).   Such statutory trust continues until all trust claims have been paid or discharged, or all assets have been applied for trust purposes.  *New York Lien Law §70(3)*.  The Court thus finds that a technical trust was created when Jones Contracting received advance payments from Silvestri Homes  under the contract and  that Jones Contracting was therefore acting in a fiduciary capacity as a trustee with respect to such funds.

The Court further finds that the fiduciary obligations of Jones Contracting in this regard extended to Jones individually by virtue of his status as the owner and principal of the company and as the person with control over the disposition of the advance payments received from Silvestri

---

[21]

As an alternative to placing funds in an escrow account, *Lien Law §71-a(4)(b)* allows the contractor to post with the owner of the residence a bond or contract of indemnity.  There is no evidence that Jones Contracting ever did so in this case, just as discussed previously there was no evidence to show Jones was not bonded at all relevant times.

Homes. *See, e.g., Ippolito v. TJC Development, LLC*, 920 N.Y.S. 2d 108, 117-18 (Sup. Ct., App. Div. 2d Dept. 2011) (adopting rule that officers and agents of corporate contractor may be liable for the diversion of trust funds from statutory home improvement trust under the New York Law); *In re Waldron*, 2015 WL 6734481 *5 (Bankr. N.D.N.Y. Nov. 3, 2015) (debtor as sole officer and director of corporate home improvement contractor owed a fiduciary duty to beneficiary of *Lien Law* trust).

The next question is whether the evidence establishes that fraud or "defalcation" occurred sufficient to trigger the exception to discharge under *Section 523(a)(4)*. For the reasons previously discussed above with respect to *Section 523(a)(2)(A)*, the Court does not find sufficient evidence was provided to establish that Jones engaged in "fraud" while acting in a fiduciary capacity with respect to the assets of the statutory trust created by the New York *Lien Law*. That leaves defalcation as the sole remaining possible ground for finding an exception to discharge under *Section 523(a)(4)*.

As with the term fiduciary, the Bankruptcy Code does not provide a definition for defalcation. The issue of what sort of conduct by a trustee would constitute defalcation was presented in *Bullock v. Bankchampaign, N.A.*, 569 U.S. 267 (2013). The *Bullock* court noted that "defalcation" was distinct from its statutory neighbor of "fraud" in *Section 523(a)(4)*, as well as from "embezzlement" and "larceny" for that matter, because "it can encompass a breach of fiduciary obligation that involves neither conversion, nor taking and carrying away another's property, nor falsity." 569 U.S. at 275. With particular respect to the "state of mind" that a fiduciary must have to engage in defalcation within the meaning of *Section 523(a)(4)*, the *Bullock* court held:

> Thus, where the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term requires an intentional wrong. We include as intentional not only conduct that the fiduciary

knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent. Thus, we include reckless conduct of the kind set forth in the Model Penal Code. Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary "consciously disregards" (or is willfully blind to) "a substantial and unjustifiable risk" that his conduct will turn out to violate a fiduciary duty. ALI, Model Penal Code § 2.02(2)©), p. 226 (1985). See *id*., § 2.02 Comment 9, at 248 (explaining that the Model Penal Code's definition of "knowledge" was designed to include " 'wilful blindness' "). That risk "must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." *Id* .

569 U.S. at 273-74.   This holding was summarized by another court as requiring the misconduct to either (1) involve bad faith, moral turpitude, or other immoral conduct, or (2) be reckless, i.e., involve a conscious disregard or a willful blindness to a substantive and unjustifiable risk that the conduct violated the debtor's fiduciary duty.  *In re Pearl*, 502 B.R. 429, 432 (E.D. Pa. 2013).

The Court must therefore determine whether anything that Jones did with respect to the statutory *Lien Law* trust funds received from Plaintiff can be considered an intentional/reckless wrong within the bounds as set by the *Bullock* court.  When the cumulative evidence is considered, the Court concludes the answer is "yes."  The Court will first list the areas of misconduct it finds Jones to have committed with respect to the statutory trust, and then turn to a discussion of whether he had the requisite scienter  or state of mind to be held responsible for defalcation under *Section 523(a)(4)*.

The first instance of misconduct occurred at the very inception of the trust and relates to where the trust funds were deposited.  Under New York Law, advance payments received by way

of a home improvement contract "shall be deposited within five business days thereafter by the recipient in an escrow account in a bank, trust company, savings bank, or state or federal savings and loan association, *located in this state*". *N.Y. Lien Law §71-a(4)(a)* (emphasis added).  Rather than do that, Jones deposited the funds into Northwest and Erie FCU, both located in Pennsylvania.[22]

A second area of misconduct relates to the abysmal recordkeeping by Jones to document trust activities.  *N.Y. Lien Law §75* imposes detailed requirements for books and records that a statutory trustee must maintain.  For instance,  a trustee is not required to keep separate accounts for each trust "provided his books of account shall clearly show the allocation to each trust of the funds deposited in his general or special bank account or accounts."  *Lien Law §75(1)*.  The contractor's books and records for each trust must contain entries showing details for trust funds received, and for trust payments made with trust assets.  With respect to the latter, the statute is particularly explicit and demanding, providing in relevant part that the following information must be maintained:

> D.  Trust payments made with trust assets. (1) The name and address of each person to whom a payment for the purposes of the trust has been made, with moneys or other assets constituting trust assets, including payments made directly to such person on behalf of the trustee by a person from whom trust assets are receivable; (2) the date

---

[22]    Deposits that Jones made into Erie FCU related to the contract included $10,899 on January 31, 2017; $10,000 on February 17, 2017; and $1,496 on February 26, 2017, for a total of $22,395. Deposits that Jones made into Northwest related to the contract included $1,496 on March 6, 2017; $1,496 on March 10, 2017; $1,496 on March 24, 2017;  $1,496 March 30, 2017; and, $1,496 on April 5, 2017 for a total of $7,480.  The grand total of deposits was thus $29, 875 which corresponds to the total of all payments made by Silvestri Homes under the contract.

when and place where each payment was made; (3) the amount paid on each of such dates and a statement whether the payment was made in cash or by check and the manner of payment if made by some other person on behalf of the trustee; (4) with respect to each such payment a statement of the nature of the trust claim ... for which the payment is made, sufficient in any case to identify the payment as a payment

for a trust purpose and to show whether it is for labor, materials, taxes, insurance, performance under contract or subcontract, interest charges on mortgages, or other particular trust claim or item of cost of improvement; (5) if any such payment was made pursuant to contract between the trustee and the recipient of the payment, the date when such contract was made, whether it was oral or in writing, and the agreed price named therein; (6) if any such payment upon a contract or subcontract relates to a particular item or items of the improvement, or if any such payment for materials or services relates to materials furnished, or services, other than daily or weekly labor, rendered for or upon a particular item or items of the improvement, a description of such item or items; ....

*N.Y. Lien Law § 75(3)(D)*.  If the statutory trustee fails to keep the books and records required  by the statute that shall be presumptive evidence that the trustee has applied or consented to the application of trust funds actually received by him for purposes other than the purpose of the trust. *Lien Law §75(4)*.

The evidence clearly demonstrated that Jones was keeping no contemporaneous trust records whatsoever during the course of the contract to meet his obligations as a trustee under the *Lien Law*.  The only records that were presented at trial were the account records from Northwest and Erie FCU, Exhibit JJ, and a packet with a  list of purported expenses incurred by Jones Contracting in connection with the Silvestri Homes project and a few receipts, Exhibit HHH, which was not prepared by Jones until during this litigation and thus well after the fact.  To the extent these documents can even be considered as records within the meaning of *N.Y. Lien Law § 75(3)(D)*, they fall woefully short of what that statute requires.

There are too many instances of shortcomings in the records to go through them all here, but an example will convey the general sense. Jones claims a payment he made to "Advance Auto" on February 16, 2017 in the amount of $417.58 as an expense of the contract. The documents do not indicate the address of this payee, the place of payment, a statement of the nature of the purported trust claim sufficient to identify it as a trust claim and to show whether it was for labor, materials or something else under the contract. The same can be said for virtually every expense asserted to have been a proper trust payment.

The records that were presented reveal another glaring deficiency. The account statements indicate that funds other than those from the Silvestri Homes contract were being deposited into the same Northwest and Erie FCU accounts.[23]   In other words, Jones was commingling trust funds with other funds. The *Lien Law* permitted him to do so, "provided his books of account shall clearly show the allocation to each owner of the funds deposited in his general or special depositary account or accounts." *N.Y. Lien Law §71-a(4)(a).*   The records provided show no identification of the source of these other deposits and no such allocation.

Another general area of misconduct, and perhaps the most serious, is with respect to the diversion of trust assets for non-trust purposes by Jones. As was indicated above, under New York law the failure to keep proper records raises a presumption that the trustee engaged in or consented to the diversion of trust assets. *N.Y. Lien Law §75(4).* But the Court need not even rely on such

---

[23]

For the Northwest account, see for example unexplained deposits made on March 8, 2017 ($3,368.06), March 10, 2017 ($394), and April 14, 2017 ($5,552). For the Erie FCU account, see for example unexplained deposits made on February 13, 2017 ($2,254), February 21, 2017 ($354.50), and February 26, 2017 ($1,055).

40

presumption here because there is overwhelming evidence of improper use of the trust assets. Indeed, this happened right from the outset of the trust. The initial payment advance of $10,899 was placed into the Erie FCU account that at the time had a negative balance of ($1,459.47), resulting in an immediate diversion of $1,459.47 of trust assets, with the account after the deposit showing a balance of only $9,439.53.

Blatant diversions of trust assets by Jones occurred regularly thereafter. For instance, the Erie FCU account statements show that promptly after making the initial deposit Jones made out a check to himself for $550 for "back pay." That was done on January 31, 2017 and the work on the contract did not even start until February 15, 2017, so the "back pay" could obviously not have been for any labor by Jones related to the contract. The account statements also show payments from the accounts running to multiple thousands of dollars were made to "Apple I-Tunes." No explanation was provided by Jones as to how any of such payments could conceivably have had any connection to the Silvestri Homes contract.

Many other payments from the accounts were made for such things as meals at restaurants, gasoline, lodging, motor vehicle parts and repairs, and cell phone expenses. These sorts of thing, however, even if they could somehow be characterized as related to the Silvestri Homes contract (and it is impossible to determine that based on the sparse records provided) would at best be administrative or overhead expenses of the Jones Contacting business that were not properly payable from trust assets. *See, e.g., In re Spies*, 2011 WL 3295440 811 (Bankr. N.D.N.Y. July 29, 2011) (administrative expenses such as rent, telephone, automobile and miscellaneous office expenses are not authorized disbursements from trust funds, citing *Niaztat Iron Works v. Tri-Neck*

41

*Const. Corp.*, 308 N.Y.S. 2d 427 (N.Y. Sup. Ct. 1970)).  In fact, after a review of the account statements it would be fair to say that only a small minority of payments from the accounts could even conceivably have been proper trust fund payments, and even as to those it is difficult to say if they were payments for labor or materials related to the Silvestri Homes contract because of a lack of any of the detail required by the New York Law.

As a final item of misconduct, Jones has failed to account for trust assets.  Even assuming *arguendo* that all of the "expenses" cited by Jones were proper expenditures from the trust funds received (a matter discussed further below), such expenses are far below the payment of $29,875 made to him by Silvestri Homes under the contract, but Jones has not explained what happened to those remaining funds.  The failure of a trustee to maintain statutorily required books and records is presumptive evidence that the trustee has applied trust funds for purposes other than a purpose of the trust.  *See, Teves v. Greenspun*, 72 N.Y.S.3d 191 (Sup. Ct., App. Div., 3d Dept. 2018) (citing *Section 75(4) of Lien Law*).

With the scope of Jones' misconduct now laid out, the Court can proceed to determine whether the standard for defalcation under *Section 523(a)(4)* as described in *Bullock* has been met. There clearly has been no showing of any conduct by Jones concerning the trust assets that would qualify under the "bad faith, moral turpitude, or immoral" prong of the *Bullock* test  His misconduct was of the *malum prohibitum* variety rather than  *malum in se.*  There was also no evidence presented at trial to show that Jones had "actual knowledge" of his wrongdoing in the sense that he was explicitly aware that he was violating a controlling statute, which is not surprising considering the subject of the trust that was created by the New York *Lien Law*, and the duties of Jones as the

trustee thereof, did not come up at trial. The question then comes down to whether Jones "consciously disregarded" or was "willfully blind to" a "substantial and unjustifiable risk" that his conduct was violative of a fiduciary duty. *Bullock, supra,* and *see also, In re Bocchino*, 794 F.3d 376, 382 (3d Cir. 2015) (commenting that *Bullock* interpreted *Section 523(a)(4)* as including a prohibition  on discharge for defalcation committed by gross recklessness, including willful blindness).

When the Court considers all of the evidence presented, it concludes that Jones was at the very least willfully blind to his obligations as a trustee. Jones has been involved as a contractor in the construction business in various capacities for over 20 years, and has been licensed as a home improvement contractor. Prior to forming Jones Construction in 2016 Jones had been involved  in the contracting business as one of the owners of a limited liability company known as Lake Erie Remodeling and Construction. Jones testified that he had been pursued on a claim for personal liability for work done by that entity, and as a result when he was preparing to form Jones Contracting he consulted an attorney about further protecting himself and was advised to use a "fictitious name" to form the company, hence his first use of the false "Michael Jones" persona as discussed previously.[24] Jones Contracting is no longer operating, but Jones is now the owner of another business known as Great Lakes Inspection Service which performs home inspections.

---

[24] While the Court did not find Jones' use of the false name relevant for purposes of *Section 523(a)(2)(A)* because there was no evidence that Silvestri Homes had relied on the false name in entering the contract, it is relevant as part of an overall picture of Jones' legal shrewdness for purposes of determining whether his conduct meets the reckless disregard/willful blindness standard under *Section 523(a)(4)*.

Jones supplied the contract form which became the contract between Jones Contracting and Silvestri Homes in the present case and said that he obtained it from a "collective construction suite software" that he had purchased in the mid-2000s, so he has been negotiating and entering this sort of contract for at least a decade. Even though such provision never made it into the contract, for some reason, Jones testified that he had intended for Pennsylvania law to apply to the contract, thus indicating an awareness that choice of law was an issue, that the laws of different states could vary, and that his preference was to be bound by the law of Pennsylvania. He also demonstrated familiarity with the pertinent law of Pennsylvania, having gone through the process of being licensed as a home improvement contractor in this state, and having informed Silvestri that Pennsylvania law requires contractors to be bonded. Presumably, Jones was aware that, unlike New York, Pennsylvania law does not impose a statutory trust on funds received by a home improvement contractor prior to performing work under the contract. He also expressed his view at trial as to whether the amount and timing of the deposit requirements under the contract complied with Pennsylvania Law, and whether the contract would be excused from Pennsylvania Law as a commercial contract, thereby demonstrating some familiarity with the review and interpretation of construction contract law.

Jones further demonstrated a level of legal sophistication once the contractual relationship with Silvestri Homes began to go bad. While representing himself throughout the arbitration started by Silvestri Homes, Jones was astute enough to assert a counterclaim against Silvestri Homes, and he also asserted a valid objection to *ex parte* communication between the arbitrator and counsel for Silvestri Homes that resulted in the first arbitration hearing being nullified and a second arbitration being required. In a more troubling vein, he used the false Michael Jones

44

persona in communications with counsel for Silvestri Homes to create delays in the process of service, discovery and hearing in the arbitration proceeding.

Another factor that the Court finds relevant in determining whether Jones acted with the necessary scienter to meet the *Bullock* standard with respect to his use of the trust funds is that many of the expenditures of such funds had nothing whatsoever to do with construction work – whether on the Silvestri Homes project or otherwise. The Court here is thinking primarily of the many thousands of dollars spent on iTunes, but there are other such expenditures as well. *See, e.g., In Re Dziedzic,* 452 B.R. 361, 366 (Bankr. W.D.N.Y. 2011) ("With regard to a trust arising under ... the Lien Law, the court may infer a conscious misuse from expenditures that bear no relation to any construction activity."). The present case is thus distinguishable from other cases wherein courts have been willing to deem the statutory trustee to be "innocent" for purposes of defalcation when trust funds were used on other construction projects the contractor was engaged in at the same time.

Summing up, the Court finds Jones to be no legal babe-in-the-woods when it comes to the home improvement construction business and contracts for such work. The Court finds that Jones was aware that the home improvement construction business is one that is heavily regulated. Since Jones knew that Pennsylvania Law puts requirements on contractors who engage in the home improvement business, the Court is satisfied that Jones was also aware that it was very likely that New York does as well. That being so, if Jones were to enter into a home improvement contract for property located in that state he was aware that he needed to either make sure that he reviewed and followed New York law in performing such contract, or that the contract made clear Pennsylvania law would apply. By agreeing to the contract with Silvestri Homes as he did, Jones was thus at the

45

very least consciously disregarding or being "wilfully blind" to a substantial and unjustifiable risk that his conduct vis-a-vis the advance funds he received pursuant to that contract could turn out to be a violation of a fiduciary pursuant to New York Law.  Based on that conclusion the Court finds that the requirements for an exception to discharge under *Section 523(a)(4)* have been met.

### (c)  Section 523(a)(6)

The last ground for a finding of non-dischargeability relied upon by Silvestri Homes is *Section 523(a)(6)*, and it can be dealt with quickly.  That provision pertains to debts arising from "willful and malicious injury by the debtor."  In order to meet its burden under this provision, a plaintiff must show that the Debtor's conduct in inflicting the injury was both "willful" and "malicious."  *In re Makozy*, 3013 WL *2 (Bankr. W.D. Pa. September 9, 2014).  The two terms have distinct meanings.  For an action to be willful under *Section 523(a)(6)* it must either have a purpose of producing injury or have a substantial certainty of producing injury.  *Id.* For an injury to be malicious under *Section 523(a)(6)* it must be "wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill will."  *Id.* (quoting *In re Conte*, 33 F.3d 303 (3d Cir. 1994).

Based on the discussion above concerning *Sections 523(a)(2)(A)* and *(a)(4)*, the Court does not find any of the actions undertaken by Jones to meet the requirement of a willful and malicious injury.  The closest scenario that might reach that level would be the trust-related

46

violations under the New York *Lien Law*,[25] but as the Court previously noted, those actions were not wrongful in and of themselves, but rather were wrongful because prohibited by the statute of which Jones was at least willfully blind.  Even if the Court were to find that those same actions were willful and malicious for purposes of *Section 523(a)(6)* – which it does not – the end result would be the same as the finding already made with respect to *Section 523(a)(4)*.  For these reasons, the Court finds that Silvestri homes has not met its burden to show that any part of its claim is excepted from discharge pursuant to *Section 523(a)(6)*.

### (3) Amount of Exemption

Having found that Plaintiff has met its burden of proof with respect to *11 U.S.C. §523(a)(4)*, as discussed above[26], the final issue is what is the amount of the Silvestri Homes claim that is excepted from discharge?  There are two basic components that will be considered separately: first, the amount of the basic claim itself flowing from Jones' defalcation; and second, whether any attorney fees should be added to that amount.

---

[25]

Although not argued at the time of closing, in its post-trial brief, Silvestri Homes raised a new argument to the effect that the Michael Jones misrepresentation made during the arbitration proceeding "independently qualifies" as a willful and malicious injury under *11 U.S.C. §523(a)(6)* because of the additional attorney fees it incurred as a result.  The testimony at trial established that Silvestri Homes has not paid any attorney fees related to the arbitration and that Greenspoon Marder effectively has only a contingent fee interest at this point.  *Audio Transcript of Trial* dated February 26, 2019, 1:09:52 to 1:10:18.  The Court therefore rejects the argument since Silvestri Homes has not suffered any cognizable injury as a result of the Michael Jones arbitration-related misrepresentations.

[26]

*See also* n.8, *supra*, re burden of proof.

### *(a) Basic Amount*

$29,875 is the amount that was paid by Silvestri Homes under the contract and it thus represents the corpus of the statutory trust and the starting point of the Court's analysis.  From that amount must be deducted any amounts which were paid from the trust for proper trust purposes (and properly documented by Jones, *See Teves, supra*), because such payments would result in a pro tanto termination of Silvestri Homes' ownership interest in the funds so paid pursuant to *Section 71–a (4)* of the *Lien Law,* as discussed above.[27]  Generally, payments for proper trust purposes would include payments for labor and materials for the contract work, but not for such things as corporate administrative expenses for Jones Contracting, or for the salaries of its officers.  *See, Schwadron v. Freund*, 329 N.Y.S.2d 945, 950–51 (Sup. Ct. 1972); *In re Waldorf*, 2015 WL 6734481 * 5 (Bankr. N.D.N.Y. November 3, 2015).  Any improper payments from trust funds would constitute a diversion of trust assets and a defalcation by Jones.

The only documentation provided by Jones as to payments properly made from trust funds is a list of alleged expenses, along with some pages marked as "Lowes Accounts Receivables," a billing invoice from R.E. Michael Company, and account statements and copies of checks from the Northwest account for the period from March 8, 2017 through April 27, 2017.  All this material, consisting of 27 pages, is collectively identified as Exhibit HH.  As noted above, it is obvious that Jones was not keeping contemporaneous records of the expenditures, and in particular the list of purported expenditures that appear as the first two pages of Exhibit HH were created after

---

[27]

The other two events that could terminate an owner's interest in trust funds under *Section 71-a(4)* – default or breach by the owner or substantial completion of the contract – did not occur here and need not be considered.

the fact.  In addition to Exhibit HH, the Court was also presented with Silvestri Homes' Exhibit JJ,

copies of the account records from both Erie FCU and Northwest.

Jones has attempted to justify only expenses totaling $14,131.82 in Exhibit HH.

Therefore right from the outset, he has essentially admitted being unable to account for, and hence,

responsible for improper trust diversions of $15,743.18.  Furthermore, the Court finds that many of

the expenses claimed by Jones  were not for proper trust purposes and are thus also improper trust

diversions.  This includes payments for vehicle parts and repair, meals, gas, tolls, "per diem"and

lodging.  These categories of expense are administrative/overhead in nature and were not properly

paid from trust funds. There are other claimed expenses that will have to be excluded.  The first

entry of "Symbility" is unexplained, and furthermore was incurred on January 6, 2017, before the

contract was even signed.  There are also a number of payments shown to "Chris J.," an apparent

reference to the Debtor himself, but as an officer of Jones Contracting he was not authorized to be

paid from trust funds under New York Law.

The number of excludeable expenses from the list in Exhibit H is so great, that it is easier

to list the ones the Court finds to be  properly allowable.  These are:

| Date | Transaction Type | Amount |
|------|------------------|--------|
| 2/16/17 | Value Home Center | $   20.04 |
| 2/16/17 | Home Depot | $     4.82 |
| 2/17/17 | Value Home Center | $    45.65 |
| 2/17/17 | Cash Pay-Jeremy and Chris | $ 1,419.00 |

| Date | Description | Amount |
|------|-------------|--------|
| 2/17/17 | Home Depot | $ 129.85 |
| 2/21/17 | Home Depot | $ 88.27 |
| 2/22/17 | Check-Jeremy | $ 304.00 |
| 2/26/17 | Check-Jeremy | $ 340.00 |
| 2/27/17 | Home Depot | $ 1,131.32 |
| 2/28/17 | Home Depot | $ 263.97 |
| 2/28/17 | Home Depot | $ 682.40 |
| 3/1/17 | Home Depot | $ 66.23 |
| 3/1/17 | Home Depot | $ 38.17 |
| 3/23/17 | Lowes | $ 250.00 |
| 3/27/17 | IRR Supply Plumbing | $ 26.74 |
| 3/27/17 | Check-Jeremy | $ 288.00 |
| 3/28/17 | Lowes | $ 175.00 |
| 3/29/17 | Value Home Center | $ 1.08 |
| 3/31/17 | Check-Jeremy | $ 336.00 |
| 4/4/17 | Lowes | $ 75.00 |
| 4/7/17 | Jon's Worker Pay | $ 220.00 |
| 4/17/17 | Check-Jeremy | $ 480.00 |
| 4/23/17 | Check-Jeremy | $ 264.00 |
| Total | | $ 6,737.81 |

The Court therefore finds that Jones has demonstrated properly documented trust purpose payments of $6,737.81. It also wishes to stress that in making this determination it has given Jones the benefit of some close calls in recognition of the general principle that exceptions to discharge are to be construed narrowly in favor of the debtor. For instance, the large cash payment of $1,419 to "Jeremy and Chris" made on February 17, 2017, can be questioned on a couple of counts. One is that it occurred only two days after the work was started, which seems to be a much quicker payment than an employee might usually expect, and could possibly represent payment for other, unrelated work. Second, the "Chris" who received payment is not further identified, and could conceivably be Chris Jones, though the Court will assume it was employee Chris Slater who did some work on the project. Also, it might be argued that there is no proof that the checks to Jeremy on April 17th and 23rd were related to work done on the Silvestri Homes job since that work ended on April 6th. Finally, a rigorous application of the accounting requirement would require Jones to identify the materials that were purchased from Lowes, Home Depot and the other suppliers noted above, but the Court has not insisted on that.[28]

Since Jones has proven $6,737.81 in proper trust payments, he is liable to Silvestri Homes in the amount of $23,157.91 for defalcation as a trustee, and such amount is excepted from

---

[28]

Two other claimed expenses not shown on the expense list of Exhibit HH came up at trial but are not recognized by the Court. One was for a furnace installed on the Property. Jones provided a billing invoice from R.E. Michael Company totaling $1,259.82, apparently for the furnace and related components. There was, however, no evidence presented to show that this invoice was ever paid by Jones Contracting. The other was for a $2,000 payment from the Erie FCU account made to Giant Eagle on February 8, 2017. Jones testified that this was for gift cards from suppliers so that he could get "fuel perks," and that this "very well could have been related to the job." Without more, that is clearly insufficient to establish that expenditure as being for a valid trust purpose.

discharge under *Section 523(a)(4)*.  Silvestri Homes is seeking two other  components to be added

to the amount of its non-dischargeable claim.   One is for the additional expense that Silvestri Homes

claims to have incurred to third parties to complete the work that Jones Contracting failed to do

under the contract.  See, Exhibit KKK for a summary of those expenses.  The Court finds that such

amounts should not be added to the claim that is being excepted from discharge.  These additional

expenses represent a debt arising from breach of contract,  not a debt related to the defalcation by

Jones in his capacity as trustee.  The Court finds this somewhat analogous to the situation in *In Re

Ardolino*, 298 B.R. 541 (Bankr. W.D.Pa. 2003).

    While the court in *Ardolino* found the plaintiff's claim against the debtor/landlord for

failure to return a security deposit to be excepted from discharge in the amount of $2,400 pursuant

to *Section 523(a)(4)*,[29] it held that the additional statutory penalty of $2,400 owed by the Debtor

under Pennsylvania law for the failure to pay was not excepted from discharge since it was a penalty

imposed "regardless of whether such improper retention [of the security deposit] was the subject of

fraud, deception, or defalcation by such landlord."  As such, it could not be found nondischargeable

under *Section 523(a)(4)*.  298 B.R. at 546.  Similarly here, the failure of Jones Contracting to have

completed the work on the Property, and the resulting need for Silvestri Homes to retain someone

else to do so, was not a result of defalcation, or at least was not proven to be so by Silvestri Homes.

    There is thus no basis for finding that any debt related to the cost of completing work

on the Property should be excepted from discharge based on defalcation.  Moreover, since Silvestri

---

[29]

    *Ardolino* was decided under the embezzlement prong of *Section 523(c)(4)* rather than
defalcation by a fiduciary, but the same basic principle applies here as well.

Homes' contract was with Jones Contracting, and not Jones individually, it is questionable whether

Silvestri Homes even has a viable breach of contract claim against Jones, but if it does the debt

arising from such claim would be dischargeable.[30]


### (b) Attorney Fees


The other component of the claim asserted by Silvestri Homes includes attorney fees and

costs that it has incurred in pursuing Jones through the arbitration, and then in this bankruptcy.

Silvestri originally claimed the amount of such fees and costs to be $102,615.32 through January

31, 2019.  See, Exhibits KKK, LLL.[31]  Following Trial, Plaintiff filed Amended Exhibit LLL to

reflect additional attorney fees and costs accruing since January 31, 2019.  That additional amount

is all attributable to Trial Counsel, Cohen & Grigsby, and is in the amount of $15,864.32.  Therefore,

the current, total amount of attorney fees and expenses that Plaintiff seeks to be added to its claim

that is excepted from discharge is $118,479.64.[32]

---

[30]

In making a claim against the Debtor, personally, the Plaintiff could have invoked a "piercing the corporate veil" theory.  During closing argument the Court inquired of Plaintiff's Counsel whether that was Plaintiff's intent.  Plaintiff declined the "invitation" stating that while "we could pierce the corporate veil here" the basis for Plaintiff's claim against the Debtor under its various theories was based on "his fraudulent representations."  See Audio Transcript of Closing Argument dated June 25, 2019, 10:59:31 to 11:11:11.

[31]

$54,216.60 of these fees and costs are attributable to Greenspoon Marder, P.A., the firm that represented Silvestri Homes in the arbitration.  $48,398.72 of that amount is attributable to Cohen and Grigsby, the firm that has represented Silvestri Homes in the bankruptcy.

[32]

Cohen & Grigsby's updated claim for attorney fees and costs is $64,201.14 which does not include fees for 68 hours of identified time from February 1, 2019 which it also expended in completing its representation of the Plaintiff through this point in the litigation but chose not to make claim for against the Debtor.

Silvestri Homes has made a number of arguments as to why it should be entitled to have attorney fees added to any nondischargeable debt found by the Court. It claims that the attorney fees awarded as part of the arbitration are "ancillary" obligations and should be included in any award.[33]

---

[33]

Plaintiff relies on *In re Grigg*, 2013 WL 5771870 (Bankr. W.D. Pa. October 23, 2013), *affd*. 619 Fed. Appx. 195 (3d Cir. 2015) where the court found that pre-petition attorney fees that had been awarded to the non-dischargeability plaintiff as ancillary obligations in a pre-bankruptcy state court judgment were also non-dischargeable, stating: "[t]he Court follows those courts that have held that such obligations carry the status of the debt and where the debt is nondischargeable the ancillary obligations are likewise." *Id*. at *11. *Grigg*, however, is distinguishable from the present case in that here there is no judgment outside the bankruptcy setting awarding attorney fees, only the arbitration award, which was never reduced to judgment and has now expressly been found void by this Court for reasons previously explained. Moreover, the *Grigg* court did not find that attorney fees incurred by the plaintiff in the course of the bankruptcy proceeding should also be added to the non-dischargeable debt.

The court in *Financial Casualty & Surety Co., Inc v. Thayer*, 559 B.R. 102 (D.N.J. 2016) relied on *Grigg* and affirmed a bankruptcy court order that had awarded attorney fees as a component of a non-dischargeable debt. Unlike *Grigg*, there was no underlying state court judgment awarding attorney fees, and the attorney fees that were allowed were those incurred in the bankruptcy itself. *Thayer* is not binding on this Court and is not found to be persuasive. The rationale employed by the court in *Thayer* was that the plaintiff in the non-dischargeability action would not have incurred attorney fees and costs in the bankruptcy proceedings if the debtor had not attempted to discharge a non-dischargeable debt caused by violating *Section 523(a)(4)*. 559 B.R. at 122. That seems far too sweeping an outcome and is not mandated by *Grigg*. Under the *Thayer* logic, for instance, a creditor that seeks and obtains relief from stay over the opposition of the debtor could then seek its attorney fees because the creditor would not have incurred such fees if the debtor had not filed bankruptcy and then opposed relief from stay.

In other words, the *Thayer* case seems to open the door to an assault on the longstanding "American rule" under which litigants, including those in bankruptcy, bear their own attorney fees in the absence of an applicable contractual or statutory provision that provides otherwise. Such a drastic change could also have an undesirable "chilling" effect on routine bankruptcy litigation, with parties becoming fearful of pursuing claims and objections lest they be saddled with the attorney fees of their opponents if they lose. *Grigg* merely provides that if there is a judgment on the underlying nondischargeable debt that includes an award of attorney fees, such attorney fee award will itself be non-dischargeable. There is no such judgment in the present case, and the Court finds no basis for awarding fees related to the legal representation inside the bankruptcy. *See, e.g., In re Harland*, 235 B.R. 769 (Bankr. E.D. Pa. 1999) (including attorney fee awarded in state court judgment as part of debt found to be non-dischargeable, but refusing to add any additional attorney fees incurred by plaintiff in pursuing the non-dischargeability adversary proceeding).

The Court rejects that argument for three reasons.  First, as was noted in the December 20, 2018 Order denying the Silvestri motion for summary judgment and previously in this *Memorandum Opinion*, the Court has significant due process concerns about the way the fee award was entered based on an affidavit submitted by Silvestri Homes <u>after</u> the arbitration hearing, providing Jones with no opportunity to cross examine its content.  Second, the arbitration award was never reduced to judgment.  Third, now that the Court has reconsidered its previous grant of relief from stay for reasons discussed earlier, the arbitration award is void anyway and cannot be binding here.

Silvestri Homes next argues that it is entitled to attorney fees based on a provision in the construction contract between Silvestri Homes and Jones Contracting providing that in any arbitration or litigation related to the project "the prevailing party shall be entitled to <u>reasonable</u> attorney fees, costs and expenses." Exhibit B at Article 15 (emphasis added).  The obvious problem with that argument is that Jones, as an individual, was not a party to the contract, so it is difficult to see why he should be bound by it.

Silvestri appears to argue that Jones is individually bound to the attorney fee provision in the contract because the contract was procured by fraudulent inducement.[34]  However, even assuming arguendo that fraudulent inducement could result in a non-party being bound by a contract, for reasons discussed earlier the Court has concluded that the contract in this case was <u>not</u> procured

---

[34]    It was not entirely clear whether Plaintiff was taking the position that Jones could be found personally bound to the contract between Silvestri Homes and Jones Contracting based on a piercing the corporate veil theory.  There is nothing to that effect in its Complaint or the Pre-trial Statement, but at trial Jones was asked several questions about the observation of corporate formalities by Plaintiff's Counsel which did at least suggest groundwork for a piercing the corporate veil argument. At the final argument, however, Plaintiff's Counsel seemed to explicitly disclaim any reliance on such a theory, removing any doubt. *See also n. 30.*

by fraudulent inducement, so the principle would not apply here.  In a similar vein, Silvestri Homes

argues that Jones may be held individually liable for attorney fees because he participated in a fraud,

and the corporate form may therefore be disregarded.  Again, however, such argument is based on

the premise that there was fraud committed in this case requiring a finding of nondischargeability

of Plaintiff's claim, but the Court has not so found, not to mention that such argument appears to

have been abandoned at the closing argument in any event, as discussed in n. 30, 34, *supra*.[35]

The Court must also candidly note that it is troubled by the size of the attorney fee

request given that (a) if granted it would represent an award for attorney fees of more than four times

the award for the underlying claim, and (b) the Court is here finding in favor of Silvestri Homes only

on the basis of the New York *Lien Law*, a statute which the Silvestri Homes attorneys never cited

prior to the Court raising the issue at the post-trial final argument.  Both of those points raise

fundamental questions going to the reasonableness of the attorney fees being sought, separate and

apart from the issue of whether any attorney fees at all should be allowed and added to the non-

dischargeable claim the Court has found.[36]

---

[35]

In its post-trial brief Silvestri argues with respect to additional attorney fees it incurred due
to the misrepresentations the Debtor made about Michael Jones during the arbitration to the extent
that "[t]here can be no doubt that these representations independently qualify under *11 U.S.C.
§523(a) (2)(A)* as the creation of a debt, that would not have otherwise existed 'but for' the
fraudulent representations of the Debtor."  To the contrary, even if Silvestri incurred additional
attorney fees because of such misrepresentations by Jones, that would not implicate *Section
523(a)(2)(A)* because Jones (and Jones Contracting as well for that matter) did not thereby receive
any money, property, services, or credit  from Silvestri as that statute requires.  *See also* n. 25.

[36]

Given its decision not to award any attorney fees, the Court need not engage in a
"reasonableness analysis" and go through a detailed review of the billing records to point out
questionable entries that would not have been allowed even if attorney fees were awarded.  For
example, Plaintiff's arbitration attorney, as previously noted, Atty. Phillip Silvestri and brother of

On the question of the excessive size of the requested attorney fee, the Court is informed

by the recent opinion in *Young v. Smith*, 905 F.3d 229 (3d Cir. 2018).  In that case, a civil rights

action, the court held that a request for attorney fees under *42 U.S.C. §1988(b)* could be denied in

its entirety when the request is so outrageously excessive that it shocks the conscience of the court.

*Id.* at 236.  In reaching this conclusion the *Young* court pointed to an earlier decision in which it was

held that where a fee-shifting statute provides a court discretion to award attorney fees, such

discretion includes the ability to deny a fee request altogether when under the circumstances the

amount requested is outrageously excessive.  905 F.3d at 235-36 (citing *Clemens v. New York*

*Central Mutual Fire insurance Company*, 903 F.3d 396 (3d Cir. 2018) (applying the fee shifting

provision in the Pennsylvania Insurance Bad Faith Statute, *42 Pa. C.S.A. §8371*).

---

Plaintiff's principal, sought full compensation for all time associated with the second arbitration even though the need for such second hearing was caused by his own fault. Furthermore, Atty. Silvestri quite candidly acknowledged that his typical charge for an arbitration involving a $40-$50,000 damage claim would be $8,000 (approximately 23 hours of time at $350/hour) and possibly as much as $12,000 (approximately 34 hours of time at $350/hour) (*Audio Transcript of Trial* dated February 26, 2019, 1:35:23 to 1:35:45) yet in this matter he amassed 140 hours of time. Atty. Silvestri testified of that 140 hours of time, in addition to 15 hours of arbitration "prep time" (*Audio Transcript of Trial* dated February 26, 2019, 1:14:10 to 1:14:52), he spent another 40 hours in "document prep" (*Audio Transcript of Trial* dated February 26, 2019*: 1:14:37 to 1:14:48) – this all for a 6-hour, 4 witness, 20 exhibit arbitration. (*Audio Transcript of Trial* dated February 26, 2019, 1:21:43 to 1:21:55).  In light of the total scope of the "arbitration" phase, the Court is of the view that the witness' testimony as to the reasonableness of the services rendered for this component of Plaintiff's claim is not credible and the monies charged for the same, clearly excessive. Similarly, the fees charged by Cohen & Grigsby for representation of the Plaintiff during the "bankruptcy" phase of its claim appear to be excessive given that the litigation strategy for the bankruptcy phase was identical to that employed during the arbitration which should have considerably lessened the time needed for resolution of the bankruptcy component.  The trial itself was less than 6 hours, involved only 3 witnesses of any substance with the admission of 8 Exhibits consisting of only 175 pages of the originally proffered 63 Exhibits comprising 1,183 pages and substantially the same ones used at the arbitration (*Audio Transcript of Trial* dated February 26, 2019, 1:31:44 to 1:32:08). Perhaps implicitly acknowledging the excessive nature of the fees and to its credit, Trial Counsel did not make claim for these services.  *See* n. 32, *supra* p. 54-55.

The import of the *Young* and *Clemens* cases seems clear enough – if an award of attorney fees is discretionary with a federal court, that court may completely deny such request when the fees being sought are so excessive that the court's conscience is shocked.  In order that there be no doubt on the point, the Court here makes clear that its conscience is shocked by the total attorney fees being requested in this case.  Not only are the fees patently excessive in comparison with the relief obtained, such relief as was obtained was on the basis of a legal theory identified by the Court, and not by Silvestri's attorneys.  Thus, while it is unclear whether there is any available  discretionary authority whereby the Court could award attorney fees under the facts and circumstances presented here, to the extent there is any such authority the Court expressly declines to exercise it and declines to award anything for attorney fees and costs.

That having been said, the Court feels constrained to also point out that the unusual circumstances which led the Court to direct Debtor's bankruptcy attorney to represent him in this matter *pro bono* did put Silvestri Homes, and particularly its attorneys, in a somewhat difficult position with respect to trying to arrive at a pretrial resolution.  One of Plaintiff's attorneys expressed that view during his testimony regarding the reasonableness of the fees incurred by his client.  Plaintiff's Trial Counsel believed Debtor was being unusually rigid in settlement discussions and that he (Plaintiff's Counsel) attributed such attitude to the fact that Debtor knew he could litigate this matter to the "bitter end" without having to worry about incurring additional legal fees.  That may well be true, and if so it is unfortunate, but could not be helped.[37]  By the same token, even

---

[37]

Debtor's Counsel had essentially abandoned the Debtor when this adversary was filed despite being obligated to represent the Debtor in it based upon the original bankruptcy paperwork filed by Debtor's Counsel in this case.  Due to this inappropriate conduct, by way of sanction Debtor's Counsel was directed to represent Debtor free of charge in this proceeding.

though the Debtor may have avoided out-of-pocket attorneys fees for the representation, he did face

the distinct possibility of a six figure nondischargeability judgment being entered against him if he

were to lose his court fight.  That potential alone should have evened the playing field somewhat

during the mediation phase of the case and during settlement discussions.[38]

      To briefly recap and sum up the attorney fee issue, the Court finds that there is no basis

for a mandatory award of attorney fees, whether based on the void arbitration award, the contract

between Silvestri Homes and Jones Contracting, or any alleged fraud.  The Court is not aware of any

discretionary basis for an award of attorney fees, but if such exists the Court declines to make such

an award.

## CONCLUSION

      As is evident from the length of this *Memorandum Opinion*, what on its face may have

seemed at first blush to be a routine nondischargeability action has proven to be anything but that.

The first complication involved the post-petition arbitration decision and what effect it should have

here.  Although it originally granted relief from stay, which had the potential effect of validating that

decision, the Court has made clear since it denied Plaintiff's motion for summary judgment last

December that, for a variety of reasons, it does not believe the arbitration decision – which was

---

[38]

      The Court should also note, as a counter to its comments about the excessiveness of the fees being sought, that it was very favorably impressed by the professionalism demonstrated by Plaintiff's Trial Counsel in zealously representing their client even as unpaid fees continued to mount and the likelihood of recovery – even assuming success in the case – became far from assured.

never reduced to judgment even after relief from stay was initially granted – is entitled to any collateral estoppel effect in this case. Despite knowing the Court's view in this regard, the Plaintiff does not seem to have ever fully come to terms with the fact that it's victory in the arbitration is of no moment here and it litigated accordingly. In any event, the first order of business for the Court in this Opinion was to remove any possible lingering uncertainty as to that point by formally vacating its prior grant of relief from stay and thus voiding the arbitration award.

Next the Court reviewed what Plaintiff seemed to consider it's strongest claim for relief – an exception to discharge due to false representations under *Section 523(a)(2)(A)* – and found it to be lacking based on the evidence presented at trial. The Court found that the use of the fictitious "Michael Jones" name by Debtor to form Jones Contracting could not have been relied on by Plaintiff because it was not even aware of the name having been so used until <u>after</u> an arbitration claim had been filed. Nor could the use of such name by Debtor for the first time during the arbitration, as a means of delay, have been relied upon by Plaintiff in entering the contract with Debtor. As noted, Plaintiff's claim based on a "statement" about bonding had a number of flaws, including most significantly that Plaintiff failed to prove it was false. Finally, the Court found that the alleged misrepresentation as to the failure to buy materials with the special order deposit specified in the contract, was better explained as being a result of the circumstances that developed under the project rather than a pre-planned deception by the Debtor.

Turning then to what appeared to be a strictly secondary theory of Plaintiff – fraud or defalcation while acting in a fiduciary capacity – Plaintiff failed to produce any evidence at trial that Debtor ever admitted to being a fiduciary, thereby abandoning such argument. Even if the argument had not been abandoned, it would have to be rejected if such fiduciary status was based solely on

Debtor's position as the owner and officer of Jones Contracting. Despite having so concluded, an alternative ground for finding Debtor to have been a fiduciary was identified – this one based on New York state statutory law – and that is the basis upon which the Court ultimately rested its nondischargeability decision.

A final area requiring attention once it was determined that the Debtor had been acting in a fiduciary capacity and had engaged in defalcation with respect to the Plaintiff's project was the proper amount that should be found excepted from discharge. This included a consideration of two major categories, one being the amount of "basic damages" attributable to the defalcation, and the other being Plaintiff's claim for an award of attorney fees on top of that. It was determined that the basic amount of those damages should be limited to the amount of "trust" money that Debtor had received and not properly accounted for, thereby excluding proper trust expenditures and amounts claimed by Plaintiff for completion of the work. As to attorney fees, having found no mandatory basis for an award of such fees that would overcome the "American Rule," or, to the extent there may be a discretionary basis for doing so, because of the excessiveness of the fees being sought no fees will be awarded.

The end result of all of the foregoing is a finding in favor of the Plaintiff as having a valid claim against Debtor in the amount of $23,157.91 that is excepted from discharge pursuant to *11 U.S.C. §523(a)(4)*, and a finding in favor of the Debtor in all other respects. An appropriate order of judgment will be entered separately.

Dated: August 19, 2019

Thomas P. Agresti, Judge
United States Bankruptcy Court

Case administrator to serve:
    Helen Ward, Esq.
    Lawrence Willis, Esq.
    Debtor